```
 1                    UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF NEW YORK

 3

 4

 5      - - - - - - - - - - - - - - X
        UNITED STATES OF AMERICA    )    15CR151
 6                                  )
        vs.
 7                                       Rochester, New York
        MICHAEL O'NEILL,            )    November 12, 2015
 8               Defendant.              2:00 p.m.
        - - - - - - - - - - - - - - X
 9      MOTION

10

11                        TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE ELIZABETH A. WOLFORD
12                       UNITED STATES DISTRICT JUDGE

13

14                        WILLIAM J. HOCHUL, JR., ESQ.
                          United States Attorney
15                        BY: FRANK T. PIMENTEL, ESQ.
                          Assistant United States Attorney
16                        138 Delaware Avenue
                          Buffalo, New York 14202
17

18
                          JOSEPH M. LATONA, ESQ.
19                        403 Main Street, Suite 716
                          Buffalo, New York 14203
20                        Appearing on behalf of the Defendant

21                        C. Middlebrooks, USPO

22

23
        COURT REPORTER:   Karen J. Bush, Official Court Reporter
24                        (585) 613-4312
                          100 State Street
25                        Rochester, New York 14614
```

1                          USA V. M. O'NEILL

2                        P R O C E E D I N G S

3                    *            *            *

4

5

6              THE CLERK:  United States vs. Michael O'Neill,

7    this is case No. 15CR151EAW.

8              MR. PIMENTEL:  Good morning.  Frank Pimentel for

9    the United States.

10             MR. LATONA:  Judge, Joe LaTona on behalf of Mr.

11   O'Neill, who has waived his right to be present at these

12   proceedings.

13             THE COURT:  Yes.  Your client waived his right to

14   be present?

15             MR. LATONA:  Yes, he has, your Honor.  I met with

16   him at the Chautauqua County Jail on Tuesday.  Actually I had a

17   jurat prepared, I'm not a notary because I don't want to get

18   conflicted off of cases and what not, they didn't have a notary

19   there, but --

20             THE COURT:  You are not a notary?

21             MR. LATONA:  No, I let it lapse because that could

22   be a conflict if there is an issue if you have to testify, and

23   then see you later lawyer.  But, Judge, he did sign a document,

24   which I did see him sign it, it is just not a Jurat.

25             THE COURT:  So the record should reflect that Mr.

```
 1                     USA V. M. O'NEILL
 2   LaTona has just handed to me a waiver from Mr. O'Neill
 3   indicating that he knowingly and willingly waives his right to
 4   be present.  And you are stating on the record that you
 5   witnessed your client sign this?
 6             MR. LATONA:  Absolutely, and went through it
 7   carefully with him, your Honor.
 8             THE COURT:  Very good.  So we will waive his
 9   presence for this appearance today.  We are here today, Mr.
10   LaTona, because you filed a motion to appeal from Judge Scott's
11   detention order entered August 5, 2015.  Let me just clarify
12   something as we begin, and that is I know in your recitation of
13   the facts, you discussed the more recent appearance in front of
14   Judge Scott to make sure that your client obtained the fitting
15   for the prosthetic device that he needs.  Is that still an
16   issue or has that been resolved?
17             MR. LATONA:  Judge, yeah, I think it has been
18   resolved.  That, as a result of my last motion, Ms. Smith of
19   the Marshal Service spoke to the individuals in D.C., who,
20   basically, had reversed their earlier decision not to pay for
21   it.  They are going to pay for it, and it has been resolved,
22   and I thanked the local people here for staying on top of
23   everything.  As best I know, everything is fine.  I believe if
24   not this week, maybe next week or at some point he is going to
25   be fitted with the device.  When I saw him the other day, he is
```

```
 1                        USA V. M. O'NEILL
 2    in a wheelchair, there is a plastic covering to his leg stump,
 3    that, as I understand it, is standard procedure for the interim
 4    until he will be fitted for and hopefully receive the
 5    prosthetic device.
 6              THE COURT:  Okay.  So, the motion that you filed
 7    in regards to Judge Scott's ruling on the government's right on
 8    standing to make a detention motion.
 9              MR. LATONA:  Yeah.  Judge, if I can, and I went
10    through the law on it, and I think it is Title 18 Section
11    3145(b) that talks about the review of a detention order, so
12    it's technically not an appeal.  I don't think we get to the
13    appeal process until your Honor rules one way or the other.  So
14    that is what it is, but I think, yes, and it's devoted, at this
15    point, to the detention portion of it, Judge.  And I guess if
16    you want to hear my argument on it.
17              THE COURT:  Yes, go ahead.
18              MR. LATONA:  I think the one thing, and I don't
19    believe we will have any opposition, is the statute and the
20    case law indicates that your Honor has to provide a *de novo*
21    review.  And Judge Skretny in the *Goba* case, the Lackawanna Six
22    case, 240 F. Supp. 2d at 245 indicated that "a Magistrate
23    Judge's determination is not entitled to any deference."  In
24    that one, I was involved in the Lackawanna six case and we had
25    an extensive detention hearing before Judge Schroeder.  And it
```

                         USA V. M. O'NEILL

1

2    was a lot more than a proffer concerning the information that

3    the Government brought forth.  They were able to bring in the

4    travel, the tickets to Pakistan, certain of the information

5    putting them in Afghanistan, and things of that kind.  And I

6    submit, Judge, and, again, we can come back, it may well be,

7    and I am sure the Government would not argue the point that

8    should you feel in your discretion to have some further

9    submissions of fact of law or maybe even a hearing, but our

10   position has consistently been that under prevailing Second

11   Circuit law, and U.S. Supreme Court law, and even the Federal

12   Rules of Criminal Procedure that they all militate in favor of

13   release in this particular case.

14            Judge, when we go back to the original complaint

15   in this case, there was an affidavit from an ATF agent, there

16   was an explosion, people were summoned to the scene, it was

17   apparently advisable that other law enforcement agencies be

18   called in.  And where we started is that this agent swore in

19   his affidavit for the complaint that he saw what appeared to be

20   and IED, the improvised explosive device.  Now, Judge, since

21   1971, in the *Posnjak* case, the Second Circuit vacated that -- I

22   think it was a plea -- or was it a trial?  Oh, that's right, it

23   was Judge Curtain.  But basically they also addressed the

24   legislative history behind this particular statute.  And

25   basically what they said is this statute and the definition of

1                         USA V. M. O'NEILL

2    a "destructive device" only means those items which have no

3    legitimate use.  In fact, and that is right, that was the case

4    where a government expert came in, and when he was being

5    examined he said, "if you are going to use it to blow up a tree

6    stump, that's not a destructive device because that is a

7    legitimate use."

8              THE COURT:  But in that case, isn't it correct

9    that the commercial dynamite that the defendant was trying to

10   set off was not -- in the form that it was -- was not capable

11   of being used for a destructive purpose.  In other words,

12   additional modifications would have needed to be made to the

13   dynamite.

14             MR. LATONA:  I don't know that.  I mean, you can

15   throw a stick of dynamite and if it is anywhere near a fire or

16   whatever, it could explode.  And if you start off with a

17   Molotov cocktail and want to finish the job, so there you go,

18   you could throw it and that would be that.

19             THE COURT:  My reading of the cas subsequent to

20   that, the *United States vs. Bubar*, 567 F. 2d 192, Second

21   Circuit case from 1977, seems to distinguish the *Posnjak* case,

22   among other reasons, on that ground.  In other words, you are

23   right, a person cannot be charged with a destructive device

24   with just a component of a destructive device.  If your client,

25   in this instance, was being charged with these crimes just

1                           USA V. M. O'NEILL

2     because he had a box of nails, that isn't sufficient.  My

3     understanding of the Government's position is that these items

4     that were found, I guess a total of seven alleged destructive

5     devices, including one that had at least nails and shrapnel in

6     it, was an entire -- you know, it was ready to be lit.  If you

7     look at Government's Exhibit 3, it has a fuse on the end of it.

8                 MR. LATONA:  That's their position, Judge.  And I

9     think -- I don't think any of the Second Circuit case law after

10    *Posnjak* ever attempted to even distinguish their discussion of

11    the legislative history, which included their express

12    recognition that, in essence, to be a device or a similar

13    device under the destructive device definition, it's got to be

14    military ordinance.  Merely because it can explode is not

15    enough.  And also, Judge, we have the statutory exclusion as,

16    well, whereas if an item, albeit if all of the components are

17    there, but if it is designed or redesigned not intending to be

18    a weapon, then it doesn't fall within the statute.  And, Judge

19    one of the things that -- and it's not a big secret to the

20    Government -- I brought *Posnjak* to the attention of the

21    Magistrate Judge --

22                THE COURT:  Just so that you are all aware, I have

23    listened to the audio transcript of the first appearance in

24    front of Judge Scott, I think it was July 30th, and that issue

25    was raised.  And I also read the transcript in the subsequent

USA V. M. O'NEILL

1                          USA V. M. O'NEILL

2   appearance in front of Judge Scott where this issue was

3   addressed.  So, I am familiar with it.

4           MR. LATONA:  Okay, Judge.  Well, here is the

5   thing, one would think, you have access to the ATF and probably

6   every other law enforcement in the country, and yet what we

7   don't have is some affidavit from an expert that would address

8   what these issues were in *Posnjak:*  A, it would have no

9   legitimate use; and B --

10          THE COURT:  But according to that line of

11   reasoning, Mr. LaTona, then in any kind of detention, if I

12   understand what your argument is, any kind of detention hearing

13   that the Government is relying on this statute to support

14   detention, you would need -- and you have some kind of homemade

15   device, you would need some kind of expert testimony to support

16   the notion that this is in fact a destructive device?

17          MR. LATONA:  Absolutely not, no, I'm not saying

18   that at all, Judge.  I am not saying that.  For example,

19   certain things, such as Molotov cocktails, which were the items

20   in the cases cited by the government, we know what that is, you

21   don't need an expert.  A Molotov cocktail is either to blow

22   someone or something up, this is not what we have here.  And,

23   quite frankly, Judge, you have it from the standpoint of

24   *Posnjak* and the statutory exclusion.  Not even an affidavit

25   that says there is no way that this design could ever be

1                          USA V. M. O'NEILL

2     construed as having a legitimate purpose.  Why don't we have

3     that, Judge?  And I'm not saying in every case, I'm saying in

4     this case, with all due respect, that the issue of the

5     statutory exclusion in *Posnjak* should have been addressed.  And

6     I'm asking your Honor, with all due respect, and again with

7     this *de novo* review to open it up with a hearing, the extent of

8     which would be up to you, if you accept affidavits, as long as

9     we get the opportunity to review them, consider them and

10    respond to them, you may want to have an evidentiary hearing.

11    It's up to you, Judge, because what I submit, respectfully, is

12    that Magistrate Judge Scott had no factual or legal predicate

13    for him concluding that there is no non-malevolent use of this

14    item.  There is no basis in the record, absolutely none.

15               THE COURT:  But you would agree there is a basis

16    in the record to conclude, based on the preponderance of the

17    evidence, which I think it would just be preponderance that the

18    Government would have to show it was a destructive device to

19    address that issue, but you would agree there is evidence that

20    at the scene was items that were homemade items that were

21    explosive devices that contained nails?

22               MR. LATONA:  Well, sure, and even Magistrate Scott

23    said, "well, what would be the legitimate use," get rid of a

24    tree stump.  What do you use on a tree - metal.  And it's a

25    cleaner cut when you resolve it at the stump level.

| | |
|---|---|
| 1 | USA V. M. O'NEILL |
| 2 | THE COURT:  With the nails that are in there? |
| 3 | MR. LATONA:  Sure. |
| 4 | THE COURT:  There are a number of cases, I realize |

neither party has cited, I can't think of the cites for them,
that hold that under circumstances like this where you have a
destructive device that's homemade or was comprised of shrapnel
or what have you, that it clearly meets the definition of
destructive device under the statute.  I will give you some
cites right now. *United States vs. Waits*, 581 F. Appx. 432,
Fifth Circuit 2014, The court said, "regardless of the
co-defendant's stated intent to use the device to blow up
stumps, its design demonstrates that it was an explosive pipe
capable of releasing shrapnel, which meets the definition of
destructive device." *United States vs. Hammond*, 371 F. 3d 776,
it's an Eleventh Circuit case from 2004.  The court said there,
"even a cardboard tube explosive device, however, could be
designed to include tacks, nails or other small metal pieces.
A device so designed would be explosive "plus" and would appear
to support a jury's finding that the device was designed as a
weapon."  And then *United States vs. Johnson*, 152 F. 3d 618,
Seventh Circuit case from 1998, "there appears to be no
question, the devices in question had all the ingredients to
make a destructive device, including shrapnel."  There is also
a Northern District of Iowa case, it's unreported, 2013 Westlaw

1                           USA V. M. O'NEILL

2     4647538, "the destructive device consisted of a CO2 cartridge

3     containing powder with a fuse entrapment attached to it and

4     shrapnel consisted of nails and bbs."

5               If I am understanding your argument, Mr. LaTona,

6     your point is, even if you have a device that clearly is

7     explosive in nature, is homemade and has shrapnel in it, that

8     the Government still has to prove that there is no legitimate

9     use for this device.

10              MR. LATONA:  That's the *Posnjak* case.  That's what

11    *Posnjak* said.  That is the law in the Circuit and has been the

12    law.

13              THE COURT:  I'm not reading *Posnjak* the same way.

14              MR. LATONA:  Oh.

15              THE COURT:  *Posnjak* was dealing with, first of

16    all, a device that wasn't a destructive device, it was a

17    component of a destructive device.

18              MR. LATONA:  But it discussed the statute, it

19    discussed the legislative history and concluded that Congress

20    only attempted to prohibit items that had no legitimate use.

21    And they even addressed the issue of an explosive device, and

22    what they said there was it had to -- it had to be the essence

23    of military ordinance.  I mean, when we look to the Supreme

24    Court in the *Bond* decision that I cited, when they talk about

25    -- and that was the chemical weapon case where the Feds

1                      USA V. M. O'NEILL

2      prosecuted that lady for using those chemicals, here is what

3      the Supreme Court said in *Bond*:   "More to the point, the use of

4      something as a weapon, typically connotes an instrument of

5      offensive or defensive combat."   Webster's 3rd, and then they

6      cite that, or, "an instrument of attack or a defense in combat

7      as a gun, missal or sword."   That is the Supreme Court of the

8      United States.

9                      THE COURT:   But your argument, taken to its

10     logical conclusion, would be that any time a defendant proffers

11     any reason that he possess an item that is of a destructive

12     nature, whether it is to remove a tree stump or whatever, that

13     then the Government somehow has a burden to come forward and

14     prove that in fact he could not be using this?

15                     MR. LATONA:   That's exactly what the law is in the

16     Second Circuit, Judge.

17                     THE COURT:   And you are concluding that that is

18     the law in the Second Circuit based on *Posnjak*?

19                     MR. LATONA:   On *Posnjak* and the statute.   We have

20     to remember one thing.   There is a statutory exclusion, and

21     inviting your Honor's attention to 26 U.S.C. Section 5845(f)

22     which defines destructive device.   Here is what Congress put in

23     the statute.   "The term destructive device shall not include

24     any device which is not designed or redesigned for use as a

25     weapon.   Now, when we have a statutory exclusion, if we are at

1                        USA V. M. O'NEILL

2    a trial, they have to disprove it beyond a reasonable doubt.  I

3    think for purposes of detention, and for purposes of an

4    appropriate indictment, they have to offer some proof in that

5    area, because, again, getting back to *Posnjak* and the clear

6    language of the statute, if it's not designed as a weapon, it's

7    not prohibited.  That is what the Circuit said in *Posnjak*, that

8    is what Congress said in the statute.

9              THE COURT:  Mr. Pimentel, what do you say to Mr.

10   LaTona's argument that is the burden that the Government has?

11             MR. PIMENTEL:  Judge, the Government's burden at

12   this point is not proof beyond a reasonable doubt.  We have

13   already indicted the case.  The grand jury saw sufficient

14   evidence to return an indictment and they did so.  The

15   indictment is presumed to be regular.  That is sufficient under

16   the detention statute for the Court to proceed and determine

17   detention.

18             THE COURT:  But separate and apart from the

19   reasonable doubt standard, what about Mr. LaTona's argument

20   that on this detention issue, the Government has an affirmative

21   obligation to essentially rebut the defendant's proffered

22   reason for why he had this explosive device.

23             MR. PIMENTEL:  He has no authority for that.  The

24   only case he cites for that proposition is a case involving

25   improper restriction of cross examination at trial.  That is

1

2    far down the road from where we are right now.  He simply has

3    no authority for that proposition.

4                    THE COURT:  Is the Government proffering -- I

5    mean, I have looked at the criminal complaint and I have in

6    front of me the exhibits that were used in front of Judge

7    Scott, is the Government contending that all of these items are

8    able to be exploded.  I mean, particularly, the one I am

9    looking at is Government Exhibit 3, which is powder with nails.

10                   MR. PIMENTEL:  I mean, at this point, we have only

11   indicted the one.

12                   THE COURT:  So when you say you have only indicted

13   the one, what do you mean?

14                   MR. PIMENTEL:  The one, I think it is Government's

15   Exhibit 3.

16                   THE COURT:  The one that says "powder with nails"?

17                   MR. PIMENTEL:  Right.

18                   THE COURT:  And, in particular, the one that I am

19   looking at is indicted that in fact it was a destructive

20   device.

21                   MR. PIMENTEL:  A destructive device.

22                   MR. LATONA:  I'm sorry.

23                   THE COURT:  Go ahead.

24                   MR. LATONA:  Judge, I think he is wrong, I cited

25   more than one case.  *Reindeau* was a case under cross

                                USA V. M. O'NEILL

 1
 2      examination, but under *Posnjak* and the statutory exclusion,
 3      that is what I am relying on.  Now, Judge, with all due respect
 4      to the Government, and I think my application for your Honor, I
 5      didn't ask for disclosure of the grand jury minutes to me, I
 6      asked it for your Honor.  And he cited a section that I didn't
 7      rely on because clearly you have the power, without disclosing
 8      it to the defense, to examine the grand jury minutes in
 9      connection --
10              THE COURT:  Do you have any authority for the
11      notion that you would go and look at the grand jury minutes in
12      connection with the detention hearing?
13              MR. LATONA:  Sure.  There are a number of
14      dismissals in this district by district judges where that
15      exactly happened, Judge.  And I am inviting your attention,
16      Judge, *United States vs. Acquest,* Judge Skretny's decision, 932
17      F. Supp. 2d 453, in which there was an examination of the
18      presentation to the grand jury and the indictment was dismissed
19      for misconduct, certain evidence was brought in that shouldn't
20      have been brought in.  Judge Arcara's --
21              THE COURT:  But that didn't have anything to do
22      with a detention hearing, just based on what you just said.
23              MR. LATONA:  Well, that had to do with the
24      validity of an indictment, and here is my position --
25              THE COURT:  So I guess that is where I am

                          USA V. M. O'NEILL

1

2    confused, Mr. LaTona, because I understand you filed a motion,

3    I know it's not an appeal, but you filed a motion seeking me to

4    reverse Judge Scott's detention order, and then in that motion

5    you have an argument about the disclosure of grand jury

6    minutes, but I am not reading this as a motion to dismiss the

7    indictment based on insufficient evidence presented or evidence

8    presented to the grand jury or insufficient instructions or

9    lack of instructions.

10                   MR. LATONA:  We're not there yet.  That motion is

11   coming.

12                   THE COURT:  But see, that is where --

13                   MR. LATONA:  But --

14                   THE COURT:  Let me finish.

15                   MR. LATONA:  Fine.

16                   THE COURT:  That's where I am confused because all

17   of a sudden in this motion that has been filed with respect to

18   a detention issue, you have argument in there about disclosure

19   of grand jury minutes.  And it's not clear to me what authority

20   you are relying on that the Court, if the Government has

21   proffered evidence in support of detention, would nonetheless

22   go behind the indictment and view the grand jury minutes to

23   determine whether or not there should be detention.

24                   MR. LATONA:  Well, no, no, whether there is a

25   valid charge.  As he just argued --

1                        USA V. M. O'NEILL

2              THE COURT:  So, but that is my point.  Let me

3     finish.  If you are questioning whether or not there is a valid

4     charge, then why aren't you moving to dismiss the indictment or

5     seeking by formal motion to disclose the grand jury minutes?

6              MR. LATONA:  Well, I think it relates to detention

7     insofar that if we don't have a valid indictment, then what is

8     the basis to even detain my client?  And we have had judges

9     here look beyond it, because here is my position --

10             THE COURT:  You think judges here look beyond it

11    even in connection with a detention issue?

12             MR. LATONA:  Not detention, but as to the validity

13    of an indictment.  When they said there is a presumption, well

14    we can get around it, and quite frankly, my view is this,

15    Judge, if they didn't present evidence that this item could be

16    used for a legitimate use, if they didn't instruct the grand

17    jury on the *Staples* decision of the Supreme Court, if they

18    didn't fashion instructions under *Posnjak* and the statutory

19    exclusion, the grand jury was not allowed to properly do its

20    independent duty, which has been found by other judges in here,

21    in Buffalo, albeit not on detention issues but other issues

22    regarding presentment to the grand jury.  And the authority for

23    it is, look it, Rule 6 says you are empowered to do it on any

24    judicial proceeding.  You are not limited --

25             THE COURT:  Even if I denied your motion, though,

                         USA V. M. O'NEILL

1
2    at this point, that that would somehow act as law of the case

3    then and preclude you from raising this issue further down

4    about the disclosure of the grand jury minutes.

5            MR. LATONA:  No, because I would move under a

6    different section.

7            THE COURT:  But if I decided, based on the face of

8    the indictment, that it is sufficient and rejected your

9    argument in that regard, you don't think that that would

10   jeopardize your ability to make this argument later on in the

11   case?

12           MR. LATONA:  Well, I hope not.  I mean, I guess

13   two things could happen.  I would hope the Court would keep an

14   open mind, and, of course, not saying it would happen, but

15   whatever you do here is reviewable in New York City by the

16   Second Circuit, so, I mean, I just don't know.  But when they

17   say I have a valid indictment, it's presumed to be all fine and

18   good, well, that opens up an opportunity for me to say, well, I

19   think the Court should look at it to see if the instructions to

20   this jury comported with Supreme Court law, Second Circuit law,

21   and the statute itself.

22           THE COURT:  Mr. Pimentel, does the government

23   agree with Mr. LaTona that at some point the government has to

24   prove that there was no legitimate use for this device as part

25   of its affirmative obligation in proving this charge?

1                    USA V. M. O'NEILL

2              MR. PIMENTEL:  Well, yes, that's in the statute,

3    the legitimate use.  But that is an issue for the jury to

4    ultimately decide.

5              THE COURT:  And they could find that based on

6    circumstantial evidence and evidence found at the scene and

7    other paraphernalia and so forth?

8              MR. PIMENTEL:  Right.  And Judge Scott considered

9    the evidence as it was presented to him, decided in the first

10   instance, yeah, looking at this, I don't see any legitimate

11   use, therefore the charge, I think, is valid to go forward and

12   sufficient to detain on.

13             THE COURT:  Would the Government need expert

14   evidence to prove that there was no legitimate reason?

15             MR. PIMENTEL:  Judge, I don't know about that.  I

16   don't know if I can admit to that at this point.  Perhaps, But

17   I just don't know the answer to that, that at trial, we would

18   need expert testimony.

19             THE COURT:  Okay.

20             MR. LATONA:  Lastly, Judge, I did bring the *Bond*,

21   Supreme Court decision in *Bond* to your Honor's attention about

22   the chemical weapons and what not.  And the way I look at it,

23   particularly in light of New York State having adopted its own

24   statutes, that we have a federalism issue here in terms of

25   whether this case should even be in federal court.

1                    USA V. M. O'NEILL

2              THE COURT:  I guess, yeah, explain to me your

3    argument about that.

4              MR. LATONA:  Judge, yeah, I think it was pretty

5    ground breaking in the *Bond* decision.  Basically there is a

6    treaty that arose, I think after the Iran/Iraq war prohibiting

7    the use of chemical warfare.  We signed the treaty.  A statute

8    was passed based on that treaty.  There was a women who got

9    upset at her husband's lover and she planted some of these

10   chemicals in and around the post office box and things like

11   that.  Prosecuted in state court.  The Feds indict under the

12   section 229.  The issue the defendant constantly raised was

13   this is an issue of the state's police power and not a federal

14   matter.  It went all the way to the Supreme Court, which said,

15   "that's correct."  Under concepts of federalism and the Tenth

16   Amendment, which basically says, any right not specifically

17   surrendered to the Federal Government by the states, is

18   reserved under the states.

19              Now, I know he cited the *Dodge* case that raised

20   the constitutionally challenge to the statute, but it's totally

21   off the mark.  Even in *Bond*, the Supreme Court did not

22   invalidate the statute, basically what it said is this:  Before

23   we will authorize the federal government to intrude into a

24   matter within the state police power, there would have to be a

25   specific declaration by Congress that this is what they

1                    USA V. M. O'NEILL

2    intended to do.  I guess the perfect example of this, Judge,

3    would be we in New York have a statute on explosives, but let's

4    say Utah doesn't, where they haven't, as a matter of police

5    policy, set up this type of situation.  So you can have a case

6    where maybe this statute is fine there but not fine here.  And

7    certainly wasn't in the *Bond* decision and so there is a concept

8    of federalism, I think that should be considered.

9              THE COURT:  But that, again, sounds to me as

10   though an argument that you would make support of a motion,

11   perhaps, to dismiss an indictment.

12             MR. LATONA:  Certainly.

13             THE COURT:  You are raising it, though, at the

14   detention level, and you are expecting that I would resolve

15   that issue before determining whether or not the government

16   would be able to detain the defendant.

17             MR. LATONA:  By raising it, I hope you look at it.

18   Whether you predicate your decision on it, is up to you.

19             THE COURT:  Okay.  Anything else, Mr. LaTona?

20             MR. LATONA:  That's it.

21             THE COURT:  Mr. Pimentel?

22             MR. PIMENTEL:  No, your Honor.

23             THE COURT:  All right.  Anything, Officer

24   Middlebrooks, from Probation?

25             PROBATION:  No, Judge.

1                    USA V. M. O'NEILL

2            THE COURT:  Okay.  I will reserve and issue a

3     decision hopefully very soon.

4            MR. LATONA:  Thanks, Judge.

5            THE COURT:  Thank you.  Everybody have a nice day.

6                    *    *    *

7                 CERTIFICATE OF REPORTER

8

9      I certify that the foregoing is a correct transcript of the

10    record of proceedings in the above-entitled matter.

11

12    S/ Karen J. Bush,  RPR

13
      Official Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25