UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
--------------------------------------
UNITED STATES OF AMERICA

        -vs-                     15-CR-151

MICHAEL C. O'NEILL,

          Defendant.
--------------------------------------


        Proceedings held before the

    Honorable Hugh B. Scott, Robert H.

    Jackson Courthouse, 2 Niagara Square,

    Buffalo, New York, on July 20, 2016.


    APPEARANCES:

    FRANK T. PIMENTEL,
    Assistant United States Attorney,
    Appearing for the United States.

    JOSEPH M. LATONA, ESQ.,
    Appearing for Defendant.

    AUDIO RECORDER:  Giuseppe A. Ippolito


    TRANSCRIBER:     Michelle L. McLaughlin, RPR,
                   Court Reporter,
                   (716)332-3560


    (Proceedings recorded by electronic sound
    recording, transcript produced by computer.)

1                          I N D E X

2              WITNESS                              PAGE

3       JASON BERNHARD
      Direct Examination by Mr. Pimentel              5
4     Cross-Examination by Mr. LaTona                19

5       JOSEPH R. TAYLOR
      Direct Examination by Mr. Pimentel             48
6     Cross-Examination by Mr. LaTona                60
      Redirect Examinatin by Mr. Pimentel            75
7     Recross-Examination by Mr. LaTona              77

8       WILLIAM EVANS
      Direct Examinatin by Mr. LaTona                80
9     Cross-Examinatin by Mr. Pimentel               90

10

11        GOVERNMENT EXHIBITS                       EVD.

12                  1                                19

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Case number 15-CR-151, United

2    States versus Michael O'Neill.  Evidentiary

3    hearing.

4       Counsel, please state your names and the

5    parties you represent for the record.

6          MR. PIMENTEL:  Good afternoon, your Honor.

7    Frank Pimentel for the United States.

8          THE COURT:  Good afternoon.

9          MR. LaTONA:  Good afternoon, Judge.  Joe

10   LaTona here with Mr. O'Neill.

11         THE COURT:  Good afternoon.  Good

12   afternoon, Mr. O'Neill.

13      All right.  I believe you're prepared to

14   proceed today.

15         MR. PIMENTEL:  Yes, your Honor.

16         MR. LaTONA:  Yes.  Judge, based on your

17   last order, there are a couple of other things, but

18   I guess we can take it up later after the hearing.

19         THE COURT:  Whatever -- what's your

20   pleasure.

21         MR. LaTONA:  Well, Judge, I issued a

22   subpoena to Mr. Evans, who is an investigator with

23   the Niagara County Sheriff's Department, for a

24   variety of records.  He accompanied Mr. Bernhard

25   over to the ECMC for that interview.  He provided a

1    bunch of documents, and I gave them to Mr. Pimentel

2    so that they could have a copy of those documents,

3    I can have a copy of those documents.  Based on my

4    review of those documents, I'm going to need to

5    supplement my suppression motion based on some of

6    the items in there.

7        I mean I -- you know, I know why we're here.  I

8    don't want to get into other stuff.  I want to, you

9    know, confine it to the -- to the issues your Honor

10   granted a hearing on.  But I wanted to just let you

11   know based on this material --

12              THE COURT:  Supplement.

13              MR. LaTONA:  -- that we just got today,

14   I'm going to have to file a supplemental affidavit.

15              THE COURT:  All right.  Go ahead.

16              MR. PIMENTEL:  No response, Judge.  I

17   mean, I don't have anything in response to say if

18   you were looking to me for that.

19              THE COURT:  Well, I was looking if you had

20   a response.

21              MR. PIMENTEL:  No.

22              THE COURT:  You may proceed.

23              MR. PIMENTEL:  Okay.  Judge, I just have

24   one technical question.  Perhaps Mr. Ippolito can

25   steer me in the right direction.  I want to make

1    sure I've got the right cord hooked up for audio.

2              THE COURT:  If not, we can certainly cut

3    the cord.

4              MR. PIMENTEL:  Yeah, do you have to throw

5    a switch?

6              (Off the record discussion.)

7              MR. PIMENTEL:  Okay.  Ready.  Jason

8    Bernhard, your Honor.

9              THE COURT:  Mr. Bernhard, all right.

10   Mr. Bernhard, raise your right hand.

11   J A S O N   B E R N H A R D, having been duly sworn

12   as a witness, testified as follows:

13             THE COURT:  Please be seated.  State your

14   full name, spell your last and your assignment.

15             THE WITNESS:  Jason Bernhard,

16   B-E-R-N-H-A-R-D.  Special agent with the Bureau of

17   Alcohol, Tobacco, Firearms and Explosives.

18             THE COURT:  All right.  You may proceed.

19   DIRECT EXAMINATION BY MR. PIMENTEL:

20   Q.  Good afternoon, Special Agent Bernhard.  You

21   are assigned to the Buffalo office as an ATF

22   Special Agent?

23   A.  That's correct.

24   Q.  How long have you been assigned to the Buffalo

25   office, sir?

1   A.   Since September of 2001.

2   Q.   And prior to that, were you assigned anywhere

3   with ATF?

4   A.   No, not with ATF.

5   Q.   Okay.  So did you attend the academy prior to

6   that?

7   A.   Yes, I did.

8   Q.   Okay.  And that was how long?

9   A.   There was two separate academies.  In total

10  they were six months long.

11  Q.   As part of your training to become a special

12  agent, did you learn about conducting interviews of

13  suspects?

14  A.   Yes.

15  Q.   And the legal parameters that you were required

16  to follow was part of that training?

17  A.   Yes.

18  Q.   Prior to becoming a special agent, did you have

19  any law enforcement training?

20  A.   Yes.  I was a police officer with the

21  Chesterfield County Police Department.

22  Q.   Is that -- where's that?

23  A.   It's outside of Richmond, Virginia.

24  Q.   Okay.  How long were you a police officer at

25  Chesterfield County?

1    A.   Just under one year.

2    Q.   All right.   Turning -- turning our attention --

3    your attention, sir, to July 21 of 2015, did you

4    have occasion to become involved in an

5    investigation of an explosion that occurred at --

6    in Niagara County at 6761 Walmore Road?

7    A.   Yes, I did.

8    Q.   How did you become involved in that

9    investigation?

10   A.   I was contacted at home by Investigator Taylor

11   from the Joint Terrorism Task Force.

12   Q.   And Investigator Taylor, is he a sheriff's

13   deputy with Niagara County?

14   A.   Yes, he is.

15   Q.   And he's also assigned to what you described as

16   the Joint Terrorism Task Force?

17   A.   Correct.

18   Q.   All right.   And was that early in the morning

19   on the 21st?

20   A.   Yes, it was.

21   Q.   Okay.   Now, that afternoon, sometime after

22   4:00, did you have occasion to go to Erie County

23   Medical Center to attempt to conduct an interview?

24   A.   Yes, I did.

25   Q.   And why were you going there?

1   A.   To attempt to interview Michael O'Neill.

2   Q.   And why were you trying to attempt to interview

3   Michael O'Neill?

4   A.   In regards to the explosion that occurred at

5   6761 Walmore Road.

6   Q.   As part of your investigation up to that point

7   had you learned anything about his physical

8   condition?

9   A.   Yes.  We learned that he suffered an amputation

10  during the explosion, and that he had been at the

11  hospital.  And then we had learned that he was in a

12  room following treatment.

13  Q.   So, now, were you dispatched by anyone to go

14  over there, or did you determine to go on your own,

15  or if you could tell the Judge how that came about.

16  A.   I don't exactly recall who told us, but we were

17  made aware that he was in a room and decided to go

18  to the hospital and attempt to interview him.

19  Q.   And so did you go with anyone to the hospital?

20  A.   Yes.

21  Q.   Who did you go with?

22  A.   Investigator Evans from the Niagara County

23  Sheriff's Department.

24  Q.   You drove over together?

25  A.   Yes.

1    Q.   Okay.  Did you drive from Walmore Road or from

2    somewhere else?

3    A.   From Walmore Road to the hospital.

4    Q.   And had you been given any information prior to

5    arrival at the hospital as to Mr. O'Neill's

6    condition at that point?

7    A.   I just knew that he had suffered the amputation

8    and that he was now in a room.  That he had been

9    alert, or, you know, was alert.

10   Q.   So you went there and your understanding was

11   that he was alert?

12   A.   Yes.

13   Q.   All right.  When you got there, do you recall

14   how you were directed to a room?

15   A.   Yes.  I went to the ECMC police department and

16   spoke with an officer, and asked if we could

17   interview Mr. O'Neill.

18   Q.   And what did the officer say, if you recall?

19   A.   He called someone else from the hospital, and

20   determined that it was okay for us to interview

21   Mr. O'Neill.

22   Q.   So you went to -- you were directed then to the

23   room that Mr. O'Neill was in?

24   A.   Yes.  Prior to that I spoke with -- he put me

25   on the phone with the person from the hospital.

1    Q.   I see.

2    A.   And I told him we were there to interview

3    Mr. O'Neill, and they told us that -- you know,

4    provided me his room number.

5    Q.   Was -- did you understand this to be a medical

6    person?

7    A.   I believe it was either the charge nurse or --

8            MR. LaTONA:  I'm objecting to what he

9    believes.  I object to what he believes.  If he has

10   a recall, that's one thing.  But a belief is not

11   enough.  Move to strike.

12           THE COURT:  Well --

13           MR. PIMENTEL:  To the best of your --

14           THE COURT:  I'll sustain the objection.

15           MR. PIMENTEL:  I'll rephrase it.

16   BY MR. PIMENTEL:

17   Q.   To the best of your recollection, do you recall

18   the nature of the person that you spoke to, if not

19   their name?

20   A.   I do not recall their exact position within the

21   hospital.

22   Q.   In any event, were you given any guidance as to

23   whether or not you could go up?

24   A.   Yes.  They said that we could.

25   Q.   So, you and Investigator Evans then went to the

1    appointed room where Mr. -- you were told

2    Mr. O'Neill was staying?

3    A.   Correct.

4    Q.   And when you arrived there, do you recall who

5    you saw or encountered?

6    A.   Mr. O'Neill and his mother was present.

7    Q.   Did you identify yourself to either of them?

8    A.   Yes, to both of them.

9    Q.   And did -- did his mother identify herself to

10   you?

11   A.   Yes.  And Investigator Evans was familiar with

12   both of them, so he was -- they had a previous

13   relationship.

14   Q.   I see.  So when you then -- you arrived there,

15   did you explain to anyone why you were there?

16   A.   Yes.

17   Q.   What did you --

18   A.   To --

19   Q.   Go ahead.

20   A.   I explained to Mr. O'Neill and his mother that

21   we were there to figure out what happened at the

22   residence earlier that day.

23   Q.   Now, early on -- you have listened --

24   subsequent to this interview, you have listened to

25   a recording that was made at the time of that

1    interview, is that correct?

2    A.   Correct.

3          MR. PIMENTEL:  Judge, at this time I'm

4    going to play what I've marked for identification

5    as Government's Exhibit 1.

6          THE COURT:  No objection?

7          MR. LaTONA:  No objection, your Honor.

8          THE COURT:  You may proceed.

9          (The above-referenced audio recording was

10          played.)

11   BY MR. PIMENTEL:

12   Q.   Did you have an opportunity to listen to that

13   recording?

14   A.   Yes, I did.

15   Q.   And is that recording a fair and accurate

16   representation of the beginning of the interview

17   that you conducted that afternoon with Mr. O'Neill?

18   A.   That's correct.

19   Q.   Who made that recording to your knowledge?

20   A.   Investigator Evans.

21   Q.   Now, at the time that you interviewed

22   Mr. O'Neill, was he under arrest?

23   A.   No.

24   Q.   Did you advise him of any what are typically

25   called Miranda rights or Miranda warnings?

1    A.   No.

2    Q.   And so you began talking to him.  At first you

3    obtained what was called biographical information

4    from him?

5    A.   Correct.

6    Q.   And if I may, I'll step back.  Prior to that,

7    there was a comment in there -- was it you that

8    said something along the lines of "I'm not here to

9    be adversarial?"

10   A.   That's correct.

11   Q.   Okay.  And is that something that -- what was

12   the point of that?

13   A.   There was some tension I think between

14   Mr. O'Neill's mother and herself and Mr. Evans

15   regarding a previous incident, and I just wanted to

16   let them know I'm not here to yell and scream.

17   That we're just here to talk about what had

18   happened today.

19   Q.   And at any time that afternoon did you raise

20   your voice?

21   A.   No.

22   Q.   Did Investigator Evans raise his voice?

23   A.   No.

24   Q.   Did Mr. O'Neill raise his voice?

25   A.   No.

1    Q.   Did you ever display a firearm?

2    A.   No.

3    Q.   Did Investigator Evans ever display a firearm?

4    A.   No.

5    Q.   And you said earlier, I believe, you did not

6    arrest Mr. O'Neill at that time?

7    A.   That's correct.

8    Q.   So, did you ask Mr. O'Neill anything about --

9    did you ask him if he knew where he was?

10   A.   Yes.

11   Q.   And what did he say?

12   A.   He knew that he was in the hospital.

13   Q.   Did he ask anything about whether he was under

14   arrest?

15   A.   He did.

16   Q.   Do you recall what he said?

17   A.   He asked if he was under arrest, and I told him

18   that he was not.

19   Q.   Did you ask him if he had any prior law

20   enforcement experience?

21   A.   I don't recall if I asked him that.  But I knew

22   that he did.

23   Q.   Did it come up to your recollection during the

24   interview?

25   A.   It did.

1   Q.   What was said?

2   A.   His mother did inform us that he had a degree

3   from Niagara.  And he also informed us that he was

4   familiar with the law, and he mentioned some legal

5   terms.

6   Q.   Did he ask whether or not he could face

7   charges?

8   A.   Yes, he did.

9   Q.   And what did you say?

10  A.   That yes, he potentially could face charges.

11  Q.   And then did he state whether or not he would

12  answer questions?

13  A.   Yes.

14  Q.   What did he say?

15  A.   He did answer questions.

16  Q.   What did he say, if anything, about the

17  explosion that had occurred that morning?

18  A.   He explained that he had been watching YouTube

19  videos about M80s and removing tree stumps, and he

20  had made some M80s.  And then while he was making

21  some, he was using a heat gun gluing -- I would

22  call I guess the cartridge.  And while he was

23  gluing the M80, it ignited, it dropped on the

24  floor, and he attempted to put it out, and it went

25  off.

1    Q.  Did he opine as to what he viewed as the

2    legality of what he was doing?

3    A.  Yes.  He did say that it was legal depending on

4    how you use it.

5    Q.  And those -- to the best of your recollection

6    those were his words?

7    A.  Yes.

8    Q.  Did he use the term mens rea during this

9    interview?

10   A.  He did.

11   Q.  Is that something that you typically hear from

12   people that you interview -- civilians that you

13   interview in conjunction with crimes that are being

14   investigated?

15              MR. LaTONA:  Objection as to the relevance

16   in this case.

17              THE COURT:  I'll overrule the objection.

18              THE WITNESS:  No.

19   BY MR. PIMENTEL:

20   Q.  Did he say anything about whether you were

21   required to be truthful to him or not?

22   A.  He told me that he knew that we could lie to

23   him during the interview, and I told him that he

24   was right, and that we could lie to him, but that

25   we were not.

1    Q.   And did you tell him why -- why you were asking

2    him questions?

3    A.   Yes.

4    Q.   What your purpose was?

5    A.   Right.  When we got there I explained to him

6    the purpose.

7    Q.   And that was what?

8    A.   To determine what happened, you know, why it

9    happened, and, you know, if there were any more

10   devices out there, any other -- we were looking to

11   see the reasons behind basically what happened.

12   Q.   Now, when you -- when you -- at the time you

13   were there, had Mr. O'Neill been charged with

14   anything?

15   A.   No.

16   Q.   Did you ask Mr. O'Neill anything about nails or

17   BBs?

18   A.   I did.

19   Q.   And what was his response to that?

20   A.   He said, "I invoke."

21   Q.   He used the term "invoke?"

22   A.   Yes.

23   Q.   Did he then say anything after that?

24   A.   He then began asking questions about stuff that

25   was taken I believe from the residence.  And then

1    we gave -- we told him to talk with his mother and

2    see if they still wish to talk with us.  And I also

3    explained to him that other investigators from the

4    Joint Terrorism Task Force wish to speak with him.

5    We then left the room for a period of time.

6    Q.  And then did you reenter the room after a

7    period of time?

8    A.  We did.

9    Q.  And were you with anyone else at this time?

10   A.  Yeah, Investigator Evans, Investigator Taylor,

11   two FBI agents, and I do not recall their names.

12   Q.  And did you introduce who these people were to

13   any -- either Mr. O'Neill or his mother?

14   A.  Yes.  We made the introductions and

15   Investigator Evans answered the questions that

16   Mr. O'Neill had, and then we departed the room.

17   Q.  Do you know when Mr. O'Neill was charged?

18   A.  I believe he was charged the following day.

19           MR. PIMENTEL:  No further questions.

20           THE COURT:  Mr. LaTona?

21           MR. LaTONA:  Are you going to offer that

22   tape into evidence?

23           MR. PIMENTEL:  Oh, yes.  Sure.

24           THE COURT:  Received, no objection.

25           MR. LaTONA:  Okay.

1          (Government's Exhibit 1 was received into

2          evidence.)

3          MR. LaTONA:  Is that marked?  Is that like

4    Government 1?

5          THE COURT:  Government's 1 for

6    identification.

7          MR. LaTONA:  GX-1.  Okay.  Thank you.

8    CROSS-EXAMINATION BY MR. LaTONA:

9    Q.  Good afternoon, Mr. Bernhard.  I'm Joe LaTona.

10   I believe we met previously.

11   A.  Yes.

12   Q.  Do you know when it was that you first learned

13   that you were going to be a witness at this

14   hearing?

15   A.  At this hearing, when Mr. Pimentel advised me

16   that there was a hearing.  I don't remember the

17   exact date.

18   Q.  All right.  And the last time you were

19   physically present here, you and I just chit

20   chatted about general stuff out there.  Do you

21   recall that?

22   A.  Yes.

23   Q.  Okay.  Now, from the point in time that you

24   were told that you're going to be a witness by

25   Mr. Pimentel, were you given any instructions as to

1    what you should do to prepare yourself for

2    testifying?

3    A.   None specifically, just to review my reports

4    and notes.

5    Q.   Well, as you sit here now, do you have a

6    specific recall of what you reviewed in connection

7    with testifying here today?

8    A.   Yes.

9    Q.   And what was it that you reviewed?

10   A.   My Report of Investigation, and I believe he

11   had a copy of my notes as well.

12   Q.   All right.  And was there any other thing that

13   you reviewed in connection with being a witness?

14   A.   The audio recording.

15   Q.   Okay.  Other than your notes, your report, and

16   the audio, was there anything else that you

17   reviewed --

18   A.   No.

19   Q.   -- to testify?  Did you have meetings or

20   communications with Mr. Pimentel about your

21   testimony?

22   A.   I met with Mr. Pimentel once.

23   Q.   All right.  And for how long?

24   A.   Approximately a half hour I would say.

25   Q.   All right.  Was he making notes at that time?

1    A.   I do not recall.

2    Q.   Was anyone else present?

3    A.   Investigator Taylor.

4    Q.   And he's with the Niagara County Sheriff's?

5    A.   Yes, and with -- he's assigned to the JTTF.

6    Q.   All right.  Just so the record is clear --

7    A.   Right.

8    Q.   Let me put the question and we'll get there.

9    There is a Joint Terrorism Task Force in Western

10   New York?

11   A.   That's correct.

12   Q.   A number of agencies participate in that task

13   force?

14   A.   Yes.

15   Q.   Including the ATF?

16   A.   We have some -- like a liaison, correct.

17   Q.   Okay.  And the Niagara County Sheriff's

18   Department?

19   A.   Yes.

20   Q.   Now, was he making any notes on that occasion?

21   A.   I do not recall.

22   Q.   Now, you -- you indicated that there was a

23   requirement that you go to the hospital that day to

24   conduct an interview?

25   A.   I don't know about a requirement.

1    Q.  All right.  I'll withdraw that question.  How

2    did you first learn that there was the potential of

3    anybody in your agency going to ECMC to interview

4    Mr. O'Neill?

5    A.  Well, we knew he was at the hospital, that he

6    had been transported there.

7    Q.  Okay.

8    A.  I'm not sure who let us know, but I was made

9    aware that he had been put up into a room.  But I

10   don't recall the person who provided that

11   information.

12   Q.  All right.  And do you recall who specifically

13   decided that he was to be interviewed that day?

14   A.  The agents and investigators that were working

15   together.

16   Q.  All right.  And who was it?  Do you recall

17   which agent from which agency made the

18   determination that he should be interviewed?

19   A.  Well, I was one of them.

20   Q.  All right.  And was there any ATF agents

21   superior to yourself as part of these

22   communications?

23   A.  No.

24   Q.  Do you recall who it was that designated

25   Mr. Evans to go over there with you?

1   A.   No.

2   Q.   Now, do you recall reviewing any of your

3   agency's regulations regarding interviewing in

4   connection with your activities that day?

5   A.   Prior to the interview or since, in preparation

6   for this?

7   Q.   Well, either or.  Let's start with at that time

8   prior to the interview of July 21 of last year.

9   A.   No.

10  Q.   All right.  But you had in mind the regulations

11  of your agency regarding interviewing, correct?

12  A.   Correct.

13  Q.   And I think you indicated -- now did you, after

14  you knew this hearing was going forward, review any

15  agency regulations on interviewing?

16          MR. PIMENTEL:  Your Honor, objection.

17  Relevance.

18          MR. LaTONA:  I think under your order this

19  is like that foundation that --

20          MR. PIMENTEL:  No.  What he reviewed

21  afterward has nothing to do with the interview at

22  the hospital.  That's what we're here for.

23          THE COURT:  Is that the question, after?

24  Is that what you asked?

25          MR. LaTONA:  Yeah.  After.

1          THE COURT:  I'm going to allow it.  I'll

2     allow you to redirect on this.

3   BY MR. LaTONA:

4     Q.   Do you recall the question?

5     A.   Yes.  I reviewed our policy on interviews to

6     see -- to determine if there was a section on

7     recordings and interviews in the hospital.

8     Q.   Okay.  And were there any -- as you recall as

9     you sit there now, was there any indication about

10    those aspects being included in the policy?

11    A.   We have a policy on recording interviews.

12    Q.   All right.  And what is that policy as you

13    recall it?

14    A.   They're for custodial interviews where the

15    person's under arrest and at a law enforcement

16    facility.

17    Q.   All right.  So that would not apply in your

18    opinion under that regulation, is that true?

19    A.   That's correct.

20    Q.   Any other aspects about that protocol?

21    A.   No.

22    Q.   All right.  And you testified on direct that

23    you spent like six months in the academy regarding

24    ATF?

25    A.   That's correct.

1    Q.  All right.  And that you were taught regarding

2    the legal parameters of interviewing a suspect?

3    A.  Correct.

4    Q.  All right.  And what were you told about being

5    in a position to lie to a suspect?

6    A.  That it is a law enforcement technique that can

7    be used in an interview.

8    Q.  And you were trained to do that, were you?

9    A.  I don't know if we're specifically trained to

10   lie, but we're -- you can in the course of an

11   interview.

12   Q.  All right.  But how did you learn that?  When

13   did you learn that you could lie when interviewing

14   a suspect?

15   A.  I don't recall an exact date or an instructor

16   or anything.  I just recall knowing that.

17   Q.  Well, do you recall there being a regulation or

18   a manual provision to that effect?

19   A.  I do not believe there is.

20   Q.  All right.  So, it's not in the book of rules

21   and regulations as you recall it, is that true?

22   A.  Correct.

23   Q.  Now, a decision was made that day to record the

24   discussion with Mr. O'Neill, correct?

25   A.  I don't recall if I was aware that Investigator

1    Evans was going to record the interview.

2    Q.  So it's your testimony that prior to entering

3    that hospital room you didn't know that he had any

4    intention of recording the interview?

5    A.  No.  My testimony is I don't recall if I knew.

6    Q.  All right.  So that means you may have talked

7    to him about it or you may not have, you don't

8    remember as you sit here now?

9    A.  Correct.

10   Q.  Do you -- do you recall any conversation on the

11   way to the hospital with Evans as to whether he had

12   a recording device?

13   A.  I do not.

14   Q.  Now, is there anything in the manual about

15   interviewing people in a hospital?

16   A.  No, there's not.

17   Q.  All right.  Now, I think you indicated that

18   initially when you arrived at ECMC you had

19   conversations with one of their police officers?

20   A.  Correct.

21   Q.  All right.  And now that individual was a law

22   enforcement person as opposed to a health care

23   professional, correct?

24   A.  The original person I spoke with, yes.

25   Q.  All right.  Now, did you -- did you make any

1    inquiry as to whether he was under any medication

2    at that time?

3    A.   Not to the police officer, but to the person I

4    spoke with who they put me on the phone with.

5    Q.   All right.   Was there a discussion about the

6    meds?

7    A.   Yes.

8    Q.   What were you told that he was on?

9    A.   I asked if he was on medication, and they told

10   me that he -- you know, because of his injury that

11   he was.   And then I asked if he would be able to be

12   interviewed.   And they said you'd have to determine

13   that by talking to him and speaking with him.

14   Q.   All right.   So, they basically indicated to

15   give it a shot then I take it?

16   A.   They indicated that we could go to the room and

17   attempt to speak with him and gauge on our own.

18   Q.   All right.   But you don't recall the position

19   of that individual that you talked to on the phone?

20   A.   I do not recall their exact position.

21   Q.   You never went to the hospital administrator,

22   correct?

23   A.   No.   I believe I spoke with someone from the

24   administration, but I just don't recall their name

25   and their position.

1    Q.   That's what I'm saying.  Well, you're part of

2    an agency, and you know there are various levels of

3    responsibility in any agency, correct?

4    A.   Correct.

5    Q.   All right.  Had you been to ECMC before in

6    connection with an investigation?

7    A.   I have.

8    Q.   You have?

9    A.   Yes.

10   Q.   All right.  And, I mean, you know there is a

11   different chain of command over there, correct?

12   A.   I'm not familiar with their chain of command.

13   At any facility or organization there is a chain of

14   command.

15   Q.   All right.  Was there any discussion as to the

16   effect of the meds he was on and his ability to

17   communicate or understand?

18   A.   No.  He -- go ahead.

19   Q.   Now, do you recall before going over to ECMC

20   having any communication with the U.S. Attorney's

21   Office about the potential for interviewing

22   Mr. O'Neill?

23   A.   Yes.

24   Q.   And who did you speak to?

25   A.   Tim Lynch.

1   Q.  All right.  And was there a record made of that

2   conversation as far as you know?

3   A.  He may have sent an email out after the

4   conversation, but I don't know if it was like a

5   detail of what we spoke about.  I think he may have

6   sent like a follow-up to our conversation.

7   Q.  When you communicated with him, was that

8   face-to-face?

9   A.  No.

10  Q.  What form was it in?

11  A.  On the phone.

12  Q.  Telephone?

13  A.  Yes.

14  Q.  Did you make any record of that communication?

15  A.  No, I did not.

16  Q.  What did he tell you?

17  A.  I told him that we were going to the hospital

18  to interview Mr. O'Neill, and I had told him

19  that -- what had happened at the scene so far that

20  day.

21  Q.  All right.  And was there a discussion as to

22  the status that Mr. Lynch perceived Mr. O'Neill to

23  be in?

24  A.  I don't understand exactly the question.

25  Q.  You would agree that you considered O'Neill to

1    be a suspect of criminal activity at the time,

2    correct?

3    A.   A suspect, yes.

4    Q.   All right.  And you went there to accumulate

5    evidence from him if you were going to be able to

6    acquire that evidence, correct?

7    A.   I went there to speak with him to determine

8    what happened.

9    Q.   Well -- and also to gather evidence, right?

10   A.   Yes.

11   Q.   All right.  When you -- and you indicated to

12   Mr. Pimentel you were at the scene at 6761 Walmore

13   Road, correct?

14   A.   Correct.

15   Q.   That's before going to ECMC, correct?

16   A.   Correct.

17   Q.   Did you have any conversation with law

18   enforcement there as to what they had found in that

19   garage?

20   A.   Yes.  I was there.

21   Q.   All right.  What did they tell you that they

22   saw?

23   A.   I saw for myself.  They didn't necessarily tell

24   me.  I was there.  I saw it.

25   Q.   What did you see?

1    A.   The devices, the workbench, the stuff that was

2    in the fridge in the basement.

3    Q.   All right.  And at that time you had some

4    working knowledge as to the federal law regarding

5    explosives, correct?

6    A.   Correct.

7    Q.   Had you ever worked a state case involving

8    incendiary or explosive devices?

9    A.   I've worked cases with the state.  I don't know

10   that they resulted in state prosecutions for those.

11   But I've worked with local law enforcement in those

12   situations.

13   Q.   All right.  So, while you know that any

14   explosive material is illegal to possess and that

15   includes fireworks in New York State in 2015, you

16   knew that, didn't you?

17   A.   I guess I know that fireworks are illegal in

18   New York, correct.

19   Q.   You knew it back then, didn't you?

20   A.   Yes.

21   Q.   Because you worked with the state before on

22   other cases?

23   A.   Not on a fireworks.  I know as a citizen in New

24   York that fireworks are illegal.

25   Q.   All right.  And it appeared to you that there

1   was explosive material in that garage?

2   A.   Correct.

3   Q.   And you saw that before you went to ECMC?

4   A.   Correct.

5   Q.   And now did you report that to Mr. Lynch?

6   A.   Yes.

7   Q.   All right.  Now, you went over to ECMC with Mr.

8   Evans?

9   A.   Correct.

10  Q.   And what items did you have with you at that

11  time?  By that I mean did you have a gun?

12  A.   Yes.

13  Q.   All right.  And now this was last summer,

14  right?

15  A.   Correct.

16  Q.   Were you wearing a jacket, a sport jacket or

17  suit jacket like you have on now?

18  A.   No.

19  Q.   Okay.  You just had a shirt sleeve?

20  A.   I don't recall exactly what I'm wearing, but --

21  what I was wearing.

22  Q.   You don't recall any jacket, right?  We've

23  established that?

24  A.   That's correct.

25  Q.   Where was the gun?

1    A.   Typically I wear my gun underneath a shirt

2    that's pulled over it, so it's not exposed.

3    Q.   Well, specifically as you sit here now, do you

4    know whether or not that weapon was visible to

5    Mr. O'Neill?

6    A.   I don't recall.

7    Q.   All right.  Did you have handcuffs with you?

8    A.   I don't recall.

9    Q.   Did you have any waiver of rights forms with

10   you?

11   A.   I'm sure that I did.  I carry them with me.

12   Q.   All right.  Did you have a waiver of Miranda

13   rights card with you?

14   A.   Yes.

15   Q.   All right.  And you never asked him to waive

16   anything, correct?

17   A.   That's correct.

18   Q.   Now, sir, you did become aware that there came

19   a time that Mr. O'Neill was indicted by a grand

20   jury, correct?

21   A.   Correct.

22   Q.   Did you testify in front of that grand jury?

23   A.   No, I did not.

24        MR. LaTONA:  I need a sticker.  Are you

25   using numbers, Frank, or letters?

1     MR. PIMENTEL:  I used numbers.

2     MR. LaTONA:  I'll use letters.  Can I

3  approach the witness, your Honor?

4     THE COURT:  Go right ahead.

5 BY MR. LaTONA:

6 Q.  Mr. Bernhard, I want to show you what's been

7  marked as Defendant's Exhibit A.  Could you please

8  just take a look at that document and let me know

9  if you're able to identify what that is?

10 A.  Yes.  It's my Report of Investigation.

11 Q.  All right.  Now, were there any versions of

12  that in the works before it was finalized, do you

13  recall?

14 A.  I don't know if there would be versions.  I may

15  have started typing it on one day and not generated

16  it until it was done.  But it would still be the

17  same version at the end.  I'm not sure if I started

18  and completed the report in one day, if that's what

19  you're asking.

20 Q.  Okay.  Well, do you recall as you sit here now

21  whether there was anything from an earlier version

22  that was eliminated?  Was there anything deleted in

23  that report as far as you can recall?  And please

24  take a look at it for as long as you need to be

25  able to answer the question.

1        MR. PIMENTEL:  Your Honor, may I have a

2    copy of what he's looking at?

3        MR. LaTONA:  Oh, I'm sorry.

4        MR. PIMENTEL:  I don't know what he's

5    looking at.

6        THE COURT:  You may as a courtesy.

7    BY MR. LaTONA:

8    Q.  Do you have the question in mind?

9    A.  Why don't you repeat it.

10   Q.  I'll be happy to.  Now, as you indicated that

11   this report was a work in progress?

12   A.  I said I didn't recall if I started it and

13   completed it in one day.

14   Q.  Oh, okay.  You don't recall one way or the

15   other, is that true?

16   A.  I oftentimes will start typing a report and may

17   not finish it in the same day.

18   Q.  But you don't recall if that was the instance

19   here, is that right?

20   A.  That's correct.

21   Q.  All right.  And now you signed off on this

22   report?

23   A.  Correct.

24   Q.  And that was on July 28th of 2015?

25   A.  Correct.

1    Q.   It's like seven days later?

2    A.   That's correct.

3    Q.   Now, what did you rely upon in constructing

4    your report?

5    A.   Notes that I made.

6    Q.   All right.

7              MR. LaTONA:  May I?

8              THE COURT:  Go right ahead.

9    BY MR. LaTONA:

10   Q.   Mr. Bernhard, I just want to show you what's

11   been marked as Defendant's Exhibit B.  And if you

12   could take a look at that and let us know whether

13   or not you're able to identify what that is.

14   A.   These are my notes from the interview of

15   Mr. O'Neill.

16   Q.   So those notes were contemporaneously written

17   down as you were interviewing Mr. O'Neill at ECMC,

18   is that true?

19   A.   Correct.

20   Q.   Now, when you entered the room, where was he?

21   A.   He was laying in the bed.

22   Q.   All right.  And did you notice whether or not

23   he had any tubes running into his person at all?

24   A.   I don't recall if there were tubes, but I

25   recall he was hooked up to some medical

1    instruments.

2    Q.   Okay.   Any idea how many instruments he was

3    hooked up to?

4    A.   I don't recall.

5    Q.   All right.   You never asked him about that, did

6    you, yourself?

7    A.   Well, we discussed that his -- he had lost, you

8    know, the portion of his leg.   But not specifics I

9    guess.

10   Q.   Okay.   Now, he was never asked to sign any

11   statement, correct?

12   A.   That's correct.

13   Q.   Now, you -- you listened to Government Exhibit

14   number 1, correct?

15   A.   Yes.

16   Q.   And you recall hearing today you on that

17   recording saying "I'm okay if you stay."   Now, was

18   that addressed to his mom?

19   A.   Correct.

20   Q.   Okay.   And you recall that you said "I -- we're

21   not here to be adversarial with you.   We're just

22   looking to figure out what happened to you today."

23   That's what was said?

24   A.   Seems -- I don't know if it's a hundred

25   percent, but yes, it seems accurate.

1    Q.  Well, do you want to hear it again?  Can we
2    play that --
3             MR. PIMENTEL:  Just for the record, I
4    decline any remuneration from Mr. LaTona for my
5    efforts.
6             MR. LaTONA:  Very good.  Pro bono exists
7    in federal court.
8             THE COURT:  Almost doesn't exist.
9             (The above-referenced audio recording was
10            played.)
11   BY MR. LaTONA:
12   Q.  Okay.  Now, did you listen to that, sir, again?
13   All right.  And you do recall that what you said to
14   him is "I -- we're not here to be adversarial with
15   you.  We're just looking to figure out what
16   happened to you today."  Correct?
17   A.  Correct.
18   Q.  And that was the lead-in to the interview of
19   O'Neill, correct?
20   A.  No.  That was the lead-in to them I guess --
21   biographical information and --
22   Q.  Well, that was part of the interview?
23   A.  Well, it's all part of the interview, correct.
24   Q.  That's right.  And then this is the --
25   basically on this recording and as you recall it,

1    the first words put by you to the people in that

2    room was I'm okay with mom staying, and then you

3    talked to O'Neill about not being adversarial, "We

4    just want to figure out what happened to you

5    today," correct?  That's the lead-in that you just

6    heard on the tape that's in evidence as Government

7    1?

8    A.  I'm not sure if it's the very first thing that

9    we said to him, because I don't know when he

10   pressed record on the player is my --

11   Q.  Well, as you sit here now, do you recall --

12   A.  I recall that that was at the beginning of the

13   interview.  I don't know if that was my very first

14   words or if I would have introduced myself.

15   Q.  Well, is there anything that you might look at

16   that might refresh your memory as to whether you

17   said anything to him before what we just listened

18   to --

19   A.  No.

20   Q.  -- in the recording?

21   A.  No.

22   Q.  As you sit here now, in fact, did you say

23   anything to O'Neill in that room before what we

24   just heard on the tape?

25   A.  I don't recall if I did.

1  Q.  All right.  Now, when it said "adversarial,"

2  there's no mention on the tape of hey, I know that

3  maybe you and Evans had had a relationship in the

4  past.  That's not on tape and that's not what you

5  said, correct?

6  A.  No, that's not on tape.

7  Q.  All right.  Now, the term "non-adversarial"

8  appears no where in your report marked as

9  Defendant's Exhibit A, does it?

10  A.  The audio it didn't say "non-adversarial."  The

11  audio said "adversarial," and it does not.

12  Q.  Yeah, non-adversarial -- "We're not here to be

13  adversarial with you," right?

14  A.  Right, correct.

15  Q.  Does the word "adversarial" or "not

16  adversarial" appear at all in your report that you

17  prepared?

18  A.  No.

19  Q.  All right.  Now, also "We're just looking to

20  figure out what happened to you today," does that

21  language appear at all in your report?

22  A.  Well, when I explained that we're there to

23  follow up on the events that occurred earlier there

24  today --

25          MR. LaTONA:  Your Honor, could I get a

1    specific answer to a specific question?

2            THE WITNESS:  Can you repeat the question?

3    BY MR. LaTONA:

4    Q.  Sure.  Does the term "We're not here to be

5    adversarial," those words appear in your notes?

6    A.  My notes, no.

7    Q.  And they don't appear in the report either,

8    correct?

9    A.  No.  Correct.

10   Q.  And the word "non-adversarial" or "We're not

11   here to be adversarial," that's not in your notes,

12   is it?

13   A.  No.

14   Q.  Were you told to omit those words from your

15   report?

16   A.  No.

17   Q.  When you're -- you had a supervisor who signed

18   off on your report, correct?

19   A.  Correct.

20   Q.  Steven Dickey?  Is that the person?

21   A.  Yes, it is.

22   Q.  And at the time Mr. Dickey was acting resident

23   in charge of the Buffalo field office?

24   A.  Yes, he was.

25   Q.  All right.  Did Mr. Dickey have the ability and

1     unit to listen to the tape recording before he

2     signed off on your report?

3     A.   I don't recall if I had a copy of the audiotape

4     at that time.

5     Q.   All right.  Whether he heard it or not you have

6     no idea, correct?

7     A.   Correct.

8     Q.   Do you recall you talking to him about what was

9     on the tape?

10    A.   No, not at that time.

11    Q.   Was there some -- strike that.  Who came up

12    with the concept of telling O'Neill "We're not here

13    to be adversarial," whose idea was that?

14    A.   It was my idea.  It was my words.

15    Q.   And did anybody assist you in coming to the

16    decision to use those words?

17    A.   No.

18    Q.   All right.  And the words "We're just looking

19    to figure out what happened to you today," whose

20    decision was it to use those words?

21    A.   Those were mine.

22    Q.   All right.  Did anybody help you use those

23    words in speaking to O'Neill that day?

24    A.   No, they did not.

25    Q.   Now, you had some discussion with Mr. Pimentel

1    regarding mens rea.  Do you recall that?

2    A.   Yes.

3    Q.   All right.  Who brought that term up during the

4    course of the interview?

5    A.   Mr. O'Neill did.

6    Q.   All right.  And what else did he say about it?

7    In what context did he raise that term, mens rea?

8    A.   I think that he thought we were trying to trick

9    him or and he -- he just said, you know, I'm

10   familiar with mens rea.

11   Q.   All right.  Is that all he said, "I'm familiar

12   with the term mens rea?"

13   A.   He was trying to explain to us that he had like

14   a legal understanding is -- like that he knew what

15   was going on.

16   Q.   Without speculating as to what was in his head,

17   I'm just asking you what he said within the context

18   of his using the --

19   A.   He said, "I know mens rea."

20   Q.   Okay.  Did you ask any questions about what his

21   interpretation of that was?

22   A.   No, I did not.

23   Q.   Now, he also made a statement, according to

24   your testimony, that "What I did was legal,

25   depending on how you use it?"

1    A.   That's correct.

2    Q.   Did you have any conversation with him about

3    that statement?

4    A.   That was brought up in the course of the

5    interview.  We kept on talking.

6    Q.   I know.  But you quoted him in your report,

7    correct?  Look at Defendant's Exhibit A.  That's in

8    paragraph number 2.

9    A.   Yes, he said that.

10   Q.   All right.  Did you have any further discussion

11   with him about specifically what he meant when he

12   used that phrase?

13   A.   Not specifically.  We kept going with other

14   questions.

15   Q.   All right.  And as you indicated before, he did

16   talk about stump removal, correct?

17   A.   Correct.

18   Q.   You said he had seen a YouTube video, correct?

19   A.   Correct.

20   Q.   And he indicated, did he not, that there were

21   some stumps on the property?

22   A.   He did.

23   Q.   Did you ever go check to see if there were

24   stumps?

25   A.   I personally did not.

1    Q.   To your knowledge did anybody in law

2    enforcement?

3    A.   I don't know for sure if anyone did or not.

4    Q.   Now, when he used the term "invoked," do you

5    remember that?

6    A.   Yes.

7    Q.   And Mr. Pimentel was asking you about that.

8    And you interpreted that as being what?

9    A.   When he said "invoke," that to me means you

10   invoke your rights.

11   Q.   And what were the rights that you felt he was

12   invoking at that time?

13   A.   That he may not want to talk to us anymore.

14   Q.   Any other right that you had in mind?  You

15   indicated the right to remain silent?

16   A.   The right to remain silent, right.

17   Q.   Okay.  Any other rights?

18   A.   His Miranda rights.

19   Q.   And do you recall making a notation as to the

20   invocation of these rights?

21   A.   In my notes, correct.

22   Q.   Could you look at Defendant's B?  And that's

23   what you indicated, correct?

24   A.   Right.

25   Q.   Is that right?

1    A.   I wrote -- can I explain?

2    Q.   Sure.  Go right ahead.

3    A.   I wrote "Invoke rights at 4:45."  He just used

4    the term "invoke."

5    Q.   So the word, quote, rights were added by you,

6    correct?

7    A.   Correct.

8    Q.   Because you understood that he had invoked his

9    Miranda rights?

10   A.   Right.

11   Q.   Did you tell the FBI that this fellow here had

12   invoked his Miranda rights?

13   A.   I explained to them that he used the term

14   "invoke," but that he then went on to ask us

15   questions and continue -- try to continue the

16   conversation.

17   Q.   Well, did they indicate how they interpreted

18   that?

19   A.   Did who indicate?

20   Q.   The FBI.

21   A.   I don't know how they interpret it.  I told

22   them that he used the term "invoke," but that he

23   continued asking us questions.

24   Q.   Well, was there some discussion that him asking

25   you questions that you were to answer in some

1    fashion negated the invocation of the rights that

2    you wrote that he invoked?

3    A.   No, we did not have that discussion.

4    Q.   And your state of knowledge at that time

5    regarding your training and everything, was it your

6    understanding that by him asking you questions,

7    that he had rescinded an invocation of his rights?

8    A.   My understanding was he said the term "invoke,"

9    but then he kept on speaking, and we allowed him

10   time to talk to his mother without us to make sure

11   if that's the way he -- what he wanted to continue

12   doing.

13   Q.   Well, you weren't in there when he talked to

14   his mother, correct?

15   A.   No.  We left the room.

16   Q.   But you were the one who wrote in here "invoke

17   rights"?

18   A.   Right.

19   Q.   And you wrote that at 4:45 p.m --

20   A.   Correct.

21   Q.   -- that day, correct?

22   A.   Right.

23   Q.   Your notes, right?

24   A.   Correct.

25          MR. LaTONA:  That's all I have at this

1    point for Mr. Bernhard.

2              THE COURT:  Anything further?

3              MR. PIMENTEL:  No redirect.

4              THE COURT:  You may step down.

5              MR. LaTONA:  Thank you, sir.  I appreciate

6    it.

7              THE COURT:  Where are we?

8              MR. PIMENTEL:  Investigator Joseph Taylor.

9              THE COURT:  Come on in.

10             (Off the record discussion.)

11             THE COURT:  Good afternoon.  Raise your

12   right hand.

13   J O S E P H    R.   T A Y L O R, having been duly

14   sworn as a witness, testified as follows:

15             THE COURT:  Please be seated.  State your

16   full name, spell your last and your assignment.

17             THE WITNESS:  Joseph R. Taylor,

18   T-A-Y-L-O-R.  And what else, your Honor?

19             THE COURT:  And your assignment.

20             THE WITNESS:  I'm a task force officer at

21   the FBI's Joint Terrorism Task Force and

22   investigator with Niagara County Sheriff's Office.

23             THE COURT:  Thank you.  You may proceed.

24   DIRECT EXAMINATION BY MR. PIMENTEL:

25   Q.  Investigator Taylor, how long have you been a

1    sheriff's deputy?

2    A.   Since 1982.

3    Q.   So that's 34 years?

4    A.   Yes, sir.

5    Q.   And how long -- as a deputy, how long have you

6    been an investigator?

7    A.   Since '96.

8    Q.   Okay.  So about 20 years?

9    A.   Twenty years.

10   Q.   When did you join JTTF?

11   A.   Seven years ago.

12   Q.   And briefly if you could describe your duties

13   as a JTTF officer.

14   A.   To investigate issues of terrorism that come

15   across the desk of the FBI.

16   Q.   Now, how does this work in terms of your

17   day-to-day employment?  Are you a hundred percent

18   assigned to the JTTF, or are you an investigator

19   with Niagara County and then detailed, so to speak,

20   to JTTF for particular investigations?  How does

21   that work?

22   A.   I'm an employee of the Niagara County Sheriff's

23   Office.  I have an office that I report to there

24   administratively.  But my day-to-day duties, my

25   eight-hour day is spent at the Buffalo FBI.

1    Q.  All right.  So for all intents and purposes,

2    while you're with JTTF you do work on a day-to-day

3    basis for the FBI?

4    A.  Correct.

5    Q.  Turning your attention, sir, to July 21st of

6    2015, did you have occasion to become involved in

7    an investigation concerning an explosion at 6761

8    Walmore Road in Niagara County?

9    A.  Yes, I did.

10   Q.  How did you -- how did you become involved in

11   that investigation?

12   A.  I was called at home by Captain Herrington, who

13   was at the scene.

14   Q.  Captain Herrington, who is he, sir?

15   A.  It's a female.  She is a captain of Niagara

16   County Sheriff's Office who is in charge of the

17   midnight shift.

18   Q.  And briefly, what did she tell you?

19   A.  She described that they had responded to a

20   report of an injury and an explosion.  That once

21   inside, they saw some things on the wall that were

22   concerning to them.  And she requested that I

23   respond as a member of the Joint Terrorism Task

24   Force.

25   Q.  Did you -- and so you did respond to the scene?

1    A.  Yes, I did.

2    Q.  And briefly, what sorts of things did you see

3    on the wall, if anything?

4    A.  KKK poster.

5    Q.  Any Nazi paraphernalia?

6    A.  Yes.

7    Q.  So, as -- later that day then, did you have

8    occasion to go to Erie County Medical Center to

9    attempt to conduct an interview?

10   A.  Yes.

11   Q.  And how did that come about?

12   A.  I arrived at ECMC by myself.  Went upstairs,

13   located the room where Mr. O'Neill, the subject of

14   the investigation, was being treated.  And waited

15   outside that room until I was accompanied by two

16   agents from the FBI, who were to join me in the

17   attempted interview.  And we waited outside -- I

18   waited outside before they got there until Special

19   Agent Bernhard and Investigator Evans from the

20   sheriff's office finished their interview.

21   Q.  When you arrived there, did you know that

22   Special Agent Bernhard and/or Investigator Evans

23   were in the room with Mr. Evans -- or I mean with

24   Mr. O'Neill?

25   A.  I knew that they arrived ahead of me.  When I

1    arrived at the room, I could hear their voices, so

2    I stayed outside.

3    Q.   Okay.  So prior to arriving there, you did not

4    know they were there?

5    A.   No.

6    Q.   Okay.  How is it that you determined to go --

7    to go to ECMC?  In other words, did you speak to

8    anybody about whether or not you should go at that

9    time?

10   A.   Information developed at the scene was that he

11   was treated at Erie County Medical Center and had a

12   surgery.  And so from that we determined that that

13   was the place to go and talk to him.  And because I

14   was the one called by the sheriff's office for the

15   Joint Terrorism Task Force to resolve whatever

16   issues there may have been for us to investigate, I

17   was one of the ones that chose to go.

18   Q.   And who were the -- do you recall who the

19   agents were that you met -- the FBI agents that you

20   met with at ECMC?

21   A.   Yes.  Special Agent Henry Falkowski and Special

22   Agent Matthew Ploskunak.

23   Q.   And do they also work for -- or at that time

24   work for the Joint Terrorism Task Force?

25   A.   They did and still do.

1    Q.   Okay.  So, you said you waited outside of the

2    room while Special Agent Bernhard and Investigator

3    Evans were in there?

4    A.   Yes, I did.

5    Q.   And what happened -- what happened next?

6    A.   I waited until I believe it's Agent Bernhard

7    that came out and said he was cooperative -- that

8    Mr. O'Neill was cooperative with the interview.

9    And that he was fine and he was speaking

10   coherently.  The other two agents from the FBI

11   arrived to join me, and Investigator Evans was --

12   also came out of the room.

13   Q.   And do you recall what time or when in the

14   afternoon roughly this was?

15   A.   It was sometime in the 4:00 hour.

16   Q.   Did -- I'm sorry, did you say -- did Special

17   Agent Bernhard say anything about his --

18   Mr. O'Neill's memory or recall to the events?

19   A.   He said he seemed to be fine.  That he was

20   coherent answering questions.

21   Q.   Okay.  Did Special Agent Bernhard say anything

22   about the word "invoke?"

23   A.   Yes.

24   Q.   What did he tell you?

25   A.   He said that Mr. O'Neill had used the word

1   "invoke," but he never qualified what that word

2   meant.  Never gave context to what "invoke" meant.

3   Q.  So, at that point then did you enter the room?

4   A.  We had to wait -- he had some -- had to have

5   some bandaging changed.  So we waited for a

6   significant amount of time while they attended to

7   him.  And when the nurse left, then Agent Bernhard

8   and Investigator Evans introduced the three of us

9   to Mr. O'Neill and to his mother.

10   Q.  And did Investigator Evans leave at that time?

11   A.  Yes, he did.

12   Q.  Did Ms. Ross or his mother stay?

13   A.  Yes, she did.

14   Q.  And did you know her, or were you introduced to

15   her as Linda Ross?

16   A.  I understood who she was based on information

17   developed back at the crime scene.

18   Q.  Did you make any observations about

19   Mr. O'Neill's condition when you began the

20   conversation with him?

21   A.  I -- he was coherent.  He answered questions.

22   He didn't -- he showed no signs -- I kind of

23   thought there might be signs of him receiving

24   treatment for pain medication.  But I couldn't

25   detect any signs that there was any influence of

1    any medication on him.  He seemed to be coherent to

2    me.  He seemed to be normal.

3    Q.  And did you ask him -- what did you begin by

4    asking him?

5    A.  Well, when Investigator Evans introduced us,

6    there was conversation about why we were there,

7    that it was relative to the KKK poster and the

8    explosion.  And so that started the conversation.

9    Then Investigator Evans withdrew, left Agents

10   Ploskunak, Falkowski and I.  I sat and wrote the

11   notes of the interview.  And the few questions that

12   were asked were asked by Agents Falkowski and

13   Ploskunak.

14   Q.  And what did they ask him?

15   A.  Well, they -- I don't recall specifically most

16   of the questions.  But they started conversation

17   with him about what we were there for, the fact

18   that there was a KKK poster on the wall, and that

19   there were explosive device -- or destructive

20   devices found there.

21   Q.  And did he early on say anything about the

22   Joint Terrorism Task Force?

23   A.  Yes.  He said he was familiar with the Joint

24   Terrorism Task Force, and that local task force

25   officers were assigned to work at the task force

1    with the FBI.

2    Q.  And is this -- is a comment like that normal or

3    commonplace when you interview civilian witnesses?

4                MR. LaTONA:  Objection to the relevance.

5                THE COURT:  I'll sustain the objection.

6                MR. PIMENTEL:  Were you surprised when he

7    opined or when he said that he was familiar with

8    the Joint Terrorism Task Force and that task force

9    officers from other agencies are assigned to work

10   there?

11               MR. LaTONA:  Objection.  Whether he was

12   surprised or not has nothing to do with anything at

13   this hearing.

14               THE COURT:  You wish to be heard?

15               MR. PIMENTEL:  Judge, I think it goes to

16   Mr. O'Neill's state of mind, which is directly

17   relevant to why we're here.

18               MR. LaTONA:  That he was surprised?

19   What's that got to do with my client's state of

20   mind?  Nothing, with all due respect, Judge.

21               MR. PIMENTEL:  Well, going back to the

22   other question that was objected to, the fact that

23   if there was an answer allowed, that it was not a

24   normal observation, would go to the defendant's

25   state of mind.  But I was not allowed to ask that.

1    So I'm trying to get there a different route.

2           THE COURT:  Well, you'll be allowed to ask

3    it this time.  I'm going to overrule the

4    objections.

5           MR. LaTONA:  As to whether he was

6    surprised?

7           THE COURT:  Yeah, I'm going to allow it.

8    You're -- you are going to cross-examine on it.

9           MR. LaTONA:  I will, Judge.  Yes, I will.

10           THE COURT:  Go ahead.

11   BY MR. PIMENTEL:

12   Q.  Were you surprised when he said -- what he said

13    about the JTTF?

14   A.  Yes.

15           MR. LaTONA:  Same objection.

16           THE COURT:  Same ruling.  Go ahead.

17   Answer the question.

18           THE WITNESS:  Yes, I was.

19           MR. PIMENTEL:  Why were you surprised by

20    that?

21           MR. LaTONA:  Same objection.

22           THE COURT:  Continuing objection.

23           MR. LaTONA:  Yes, thank you.

24           THE COURT:  Overruled again.

25           MR. LaTONA:  Thank you.

1          THE COURT:  Go ahead.

2          THE WITNESS:  That was a very sharp

3     question to ask, and it expressed a level of

4     knowledge about how the Joint Terrorism Task Force

5     and the task force officer relationship exists

6     that's beyond the level that most people would

7     know.  However, I did know that Mr. O'Neill once

8     worked for the sheriff's office in the corrections

9     setting.  And again, I thought that was a lot of

10    information for someone to be aware of who wasn't

11    in a criminal setting at the sheriff's office.

12          MR. LaTONA:  Objection.  Move to strike.

13          THE COURT:  Overruled.

14  BY MR. PIMENTEL:

15  Q.  Was Mr. O'Neill asked whether he was a member

16    of a motorcycle club?

17  A.  Yes, he was.

18  Q.  And what did he say?

19  A.  He was not a member of a motorcycle club.

20  Q.  Was he asked with his political beliefs?

21  A.  Yes.  He said -- well, he just said based on

22    that conversation that his political beliefs were

23    nobody's business.

24  Q.  And that's what he said, "My political beliefs

25    are nobody's business?"

1    A.   Yes.

2    Q.   Did he say anything about the KK -- presence or

3    lack thereof of the KKK?

4    A.   He said there was no KKK in our area.

5    Q.   Did he describe how he made M80s?

6    A.   Yes.  He used homemade gunpowder to make F80s.

7    Q.   That's -- so he told you that, that he used

8    homemade gunpowder to make M80s?

9    A.   He said he made M80s out of homemade gunpowder.

10   Q.   Do you recall, did he say anything after that?

11   A.   He said that if he was going to be arrested, he

12   wanted a lawyer, he was done talking.

13   Q.   And did you ask him any questions after that?

14   A.   No.

15   Q.   By the way, just for the record, this

16   Mr. O'Neill, Michael O'Neill, that you talked to,

17   is he here in the courtroom today?

18   A.   Yes, he is.

19   Q.   Can you describe where he's sitting?

20   A.   Seated at the defense table with a striped

21   shirt.

22          MR. PIMENTEL:  Your Honor, I'd ask that

23   the record reflect that the witness has identified

24   the defendant.

25          MR. LaTONA:  No objection.  Judge, we

1    identified ourself before we started.

2             THE COURT:  I'm surprised.  No, I'm just

3    kidding.

4             MR. LaTONA:  I won one like that in

5    Amherst.  But no, we're not playing that game.

6             THE COURT:  I'll note the identification

7    for the record.

8             MR. LaTONA:  I can't play that game with

9    Frank, your Honor.

10            MR. PIMENTEL:  Nothing further, your

11   Honor.

12            THE COURT:  Your witness, Mr. LaTona.

13            MR. LaTONA:  Thank you, your Honor.  Thank

14   you very much.

15   CROSS-EXAMINATION BY MR. LaTONA:

16   Q.  Good afternoon, Mr. Taylor.

17   A.  Good afternoon, sir.

18   Q.  Now, when did you learn you're going to testify

19   in this hearing?

20   A.  Well, I was scheduled to testify at last

21   month's hearing.

22   Q.  And I met you outside.  We had a little chit

23   chat --

24   A.  Yes, about a month ago.

25   Q.  -- not about this case, just to say hi, how are

1    you, stuff like that?

2        Now, did you do anything to prepare yourself to

3    testify in this case?

4    A.  Yes, I did.

5    Q.  What did you do?

6    A.  I reread the 302 and the notes.

7    Q.  All right.  When you say "the 302," that would

8    be the 302 that was prepared by Mr. Falkowski,

9    Mr. Ploskunak, and yourself?

10   A.  Yes, sir.

11   Q.  And now the notes -- there was one page of

12   notes.  Do you know who it was that wrote those

13   notes?

14   A.  That was me.

15   Q.  Okay.  So these are your notes --

16   A.  Yes, sir.

17   Q.  -- is that right?  Did you look at anything

18   else in connection with your testifying?

19   A.  No.

20   Q.  Did you listen to any recording?

21   A.  No.

22   Q.  Did you review any of the files at the Niagara

23   County Sheriff's Department on this case?

24   A.  No.

25   Q.  Just this, just this material here?

1    A.   Yes.

2    Q.   You -- now, did you have face-to-face meetings

3    with Mr. Pimentel about you being a witness?

4    A.   Yes, I did.

5    Q.   How many times?

6    A.   One time.

7    Q.   Anyone else there?

8    A.   Well, two if you count today -- actually three

9    if you count the last scheduled hearing.  But we

10   spoke out in the hallway briefly.

11   Q.   Okay.  Anyone else present?

12   A.   Agent Bernhard was there.

13   Q.   All right.  So the conversation involved the

14   three of you at the same time pretty much?

15   A.   Yes, sir.

16   Q.   Anybody make any notes as to that conversation?

17   A.   No, sir.

18   Q.   And were you asked to look at anything as a

19   result of that conversation?

20   A.   No, sir.

21   Q.   All right.  Now, you indicated that -- well,

22   strike that.  Other than the 302 and your

23   handwritten notes, did you yourself generate any

24   reports as to the activities that you engaged in

25   that day?

1    A.   The entire day?

2    Q.   Well, in connection from the point in time

3    where you get a call at home up until the point in

4    time that your interviewing of Mr. O'Neill stopped.

5    Anything that you -- any report generated by you as

6    to that timeframe?

7    A.   No, sir, not beyond those notes.

8    Q.   All right.  And what about before those notes?

9    A.   There was an EC written to the file that I may

10   have had a hand in writing, just coordinating all

11   the information that came in from Niagara County

12   Sheriff's Office about the investigation.

13   Q.   All right.  When you say "EC," what does that

14   term mean?

15   A.   Electronic communication.  Just a report.

16   Q.   And that would be the files of the Niagara

17   County Sheriff's Department?

18   A.   No, sir, the FBI.

19   Q.   Oh, the FBI.

20           MR. LaTONA:  I'm requesting a copy of

21   that, Judge.  It's in that timeframe from when he

22   first got called into the case.  I'm requesting a

23   copy.  I should have gotten it as Rosario.  Or I

24   mean 26(2), forgive me.

25           MR. PIMENTEL:  Judge, I will --

1          THE COURT:  You'll check and see.

2          MR. PIMENTEL:  Sure.

3          THE COURT:  And if exists, I want it

4     produced.

5          MR. PIMENTEL:  Sure.

6          THE COURT:  That's fine.

7     BY MR. LaTONA:

8     Q.  Now, I think it was your testimony that you're

9     home in bed and you get a phone call?

10    A.  Yes, sir.

11    Q.  And that was from a lady captain with the

12    Niagara County Sheriff's Department?

13    A.  Yes, sir.

14    Q.  Do you know what time of day that was?

15    A.  About five in the morning.

16    Q.  All right.  Was there any record made as to

17    when that call came in?

18    A.  Those records would be at the Niagara County

19    Sheriff's Office.

20    Q.  So there would be a record of exactly when she

21    called you?

22    A.  It would be on a tape.  I don't know that she

23    would have recorded it in a report.

24    Q.  Well, when you say a tape, does that mean that

25    the conversation itself would have been recorded

1  from her to you at that time?

2  A.  I would correct that.  She probably called me

3  from her cell phone at the scene.  So, no, it

4  wouldn't be taped.  There would not be a record.

5  Q.  I take it you don't know either way, because

6  you don't know where she was when she called you,

7  is that fair?

8  A.  She was at the crime scene.

9  Q.  All right.  Whether there was a record made of

10 that, you weren't there, you don't know?

11 A.  I did not make a record.

12 Q.  Okay.  Whether she did or not, you don't know?

13 A.  That's correct.

14 Q.  All right.  And that record could include the

15 specific time of day that she reached out for you,

16 correct?

17 A.  Yes, it could.

18 Q.  All right.  I'm requesting that there be any --

19 I mean, he got into it in terms of this phone call

20 and anything that would indicate the time of this

21 communication.

22     Now, she had some conversation --

23         THE COURT:  Hold on.  You do want me to

24 rule on that?

25         MR. LaTONA:  Well, yes, Judge.

1           MR. PIMENTEL:  Judge, the only thing about

2     that is I don't know that I have control over that.

3     This is Niagara County files.  These aren't

4     federal --

5           MR. LaTONA:  Joint investigation.

6           THE COURT:  You'll check and see if it is

7     available.

8           MR. PIMENTEL:  Sure.

9           THE COURT:  If it is, produce.

10           MR. LaTONA:  Thank you very much, Judge.

11   BY MR. LaTONA:

12   Q.  All right.  Now, what was the conversation

13     between the captain and yourself when she called

14     you at home?

15   A.  That she was at a crime scene at 6761 Walmore

16     Road.  That there were materials on the wall that

17     were concerning from a white supremacist standpoint

18     because they had KKK information and Nazi

19     information, and that there was an explosion there

20     and other devices around.  She thought that the

21     Joint Terrorism Task Force should be aware of it.

22   Q.  Okay.  Now Captain Herrington is her name?

23   A.  Yes.

24   Q.  All right.  And what -- what unit within the

25     Niagara County Sheriff's Department was she part

1    of?

2    A.   She is the captain of the -- was the captain of

3    the midnight road patrol unit at that time.

4    Q.   Okay.  Now, in terms of your position at

5    Niagara County Sheriff, were you a criminal

6    investigator on that occasion?

7    A.   Yes.  That's my title.

8    Q.   All right.  That was your -- and now in the

9    Niagara County Sheriff's Department CIB, does that

10   refer to Criminal Investigative Bureau?

11   A.   Yes, it does.

12   Q.   All right.  And when you got to the scene, did

13   you go to the scene there?

14   A.   Yes, I did.

15   Q.   Okay.  And do you recall what time you arrived

16   at the scene?

17   A.   No, I don't.

18   Q.   All right.  Do you recall any federal agents

19   being present at that time?

20   A.   Agent Bernhard arrived.  I'm not sure if he got

21   there before I did or after I did, but at about the

22   same time.

23   Q.   All right.  So there would be federal

24   involvement, correct?

25   A.   Yes.

1    Q.   There would be members of the Niagara County

2    Sheriff's Department, correct?

3    A.   Yes.

4    Q.   Were there any ETM personnel there when you got

5    there?

6    A.   Yes, there were.

7    Q.   Okay.  And was Mr. O'Neill still at that scene

8    when you got there?

9    A.   No, he was not.

10   Q.   Okay.  Any other law enforcement agency there

11   at that time that you can recall?

12   A.   The state police arrived later.  I don't recall

13   there being a car there at that time.

14   Q.   Now, when you got to the scene, would there be

15   some record indicating exactly when it was that you

16   got there?

17   A.   There was a crime scene log maintained by the

18   road patrol.

19   Q.   Do you know who would be responsible for

20   maintaining that log?

21   A.   The file of the criminal bureau.

22   Q.   And I take it that a crime scene log would --

23   would be prepared in order to know who arrived at

24   the scene and when they arrived, is that a fair

25   statement?

1    A.   Yes.

2    Q.   Would there be somewhat of a narrative as to

3    exactly what they did when they arrived there?

4    A.   There could be.

5    Q.   Okay.  Now, did you yourself make any entries

6    into the crime scene log?

7    A.   No.

8    Q.   Have you ever seen the crime scene log?

9    A.   The crime scene log is maintained by a single

10   person who's posted at a point of entrance to the

11   crime scene.  It's used in an effort to control

12   who's coming and going so that the quality of the

13   crime scene is not -- the integrity of the crime

14   scene is not damaged.

15   Q.   Do you know who had that responsibility that

16   day at that crime scene?

17   A.   No, I don't.

18        MR. LaTONA:  I'm going to make a request

19   for that, but that may be something I might put in

20   the supplemental thing that I mentioned to you.

21        THE COURT:  All right.  Okay.  That will

22   be fine.

23   BY MR. LaTONA:

24   Q.   Now, I think the captain indicated that there

25   was some literature, something on the wall that

1    caused her concern?

2    A.   Yes.

3    Q.   Did she indicate to you there was a picture of

4    Jesus Christ on the wall?

5    A.   No.

6    Q.   Did she indicate to you there was a picture of

7    Marlon Brando on the wall?

8    A.   No.

9    Q.   Did she indicate to you there was a poster from

10   the movie Tobacco Road from Robert Mitchum in the

11   '50s, did she indicate that to you?

12   A.   No.

13   Q.   Did she indicate to you that there was a

14   Bush-Cheney election sign in the garage?

15   A.   No.

16   Q.   Do you recall seeing that sign in the garage

17   when you were there?

18   A.   Yes.

19   Q.   All right.  You recall seeing the picture of

20   Jesus?

21   A.   No, I don't.

22   Q.   Do you recall seeing the picture of Marlon

23   Brando?

24   A.   No, sir.

25   Q.   Do you recall seeing the Irish flag on the

1   wall?

2   A.   Yes.

3   Q.   Now, he was asked as to whether he was a member

4   of any motorcycle club?

5   A.   Yes.

6   Q.   And he answered that he was not?

7   A.   Correct.

8   Q.   Up until right now, have you developed any

9   information that he ever was a member of a

10   motorcycle club?

11   A.   No, sir.

12   Q.   All right.  He was asked about the Ku Klux

13   Klan, correct?

14   A.   Yes.

15   Q.   And was he asked whether he was a member of the

16   Ku Klux Klan?

17   A.   I don't recall that specifically being asked.

18   Q.   He basically said there's no Klan around here?

19   A.   Correct.

20   Q.   Implicit, meaning that they ain't here so I'm

21   not a member, is that the way you understood it?

22   A.   Yes, sir.

23   Q.   All right.  Now, there was some communication

24   from Mr. Bernhard to you about "invoke?"

25   A.   Yes.

1    Q.  And that the term itself was used without any

2    further specification?

3    A.  Correct.

4    Q.  You've heard that term "invoke" before,

5    correct?

6    A.  Yes.

7    Q.  You've been in law enforcement how long?

8    A.  Thirty-four years.

9    Q.  All right.  Well, certainly you're well aware

10   of the Miranda decision, correct?

11   A.  Yes, sir.

12   Q.  And members of your department have the Miranda

13   card when you're questioning an individual in

14   custody, correct?

15   A.  Yes, sir.

16   Q.  All right.  Now -- and Mr. Falkowski was

17   present when Mr. Bernhard said there was this term

18   "invoke?"

19   A.  I don't recall that Mr. Falkowski was present

20   at that time.

21   Q.  All right.  What about Mr. Ploskunak?

22   A.  Ploskunak.  No, I don't think he was there

23   either.

24   Q.  All right.  Well, when you went into the room,

25   was there any attempt to discuss with O'Neill what

1    did you mean by the term "invoke"?

2    A.   No.

3    Q.   You just proceeded to question, is that right?

4    A.   Yes, sir.

5    Q.   Now, how long have you been on the Joint

6    Terrorism Task Force?

7    A.   Seven years.

8    Q.   Seven years.  Okay.  And I think you did

9    indicate that you knew that Mr. O'Neill was a

10   correction officer at the Niagara County Sheriff's

11   Department?

12   A.   I had heard that information when I arrived at

13   the scene.

14   Q.   Okay.  Had you known him when he worked for the

15   sheriff's department?

16   A.   No.

17   Q.   All right.  And Mr. Evans knew that, correct,

18   Investigator Evans?

19   A.   I don't know if he knew that or not.

20   Q.   Was Mr. Evans at the scene when you got there?

21   A.   Yes, he was.

22   Q.   Okay.  Did you have any conversation with Evans

23   about Mr. O'Neill's history of law enforcement at

24   the sheriff's department?

25   A.   I don't recall having a specific conversation

1    with him there.  But I know that it was common

2    knowledge at the scene, that everyone at that point

3    knew that he had worked there.

4    Q.  All right.  And you know, certainly in law

5    enforcement there is a lot of chit-chat back and

6    forth, isn't that right?

7    A.  There can be.

8    Q.  About what's going on in our community,

9    correct?

10   A.  Yes, sir.

11   Q.  From a law enforcement standpoint?

12   A.  Certainly.

13   Q.  All right.  Now, you remember back in 2002

14   there was a case, the Lackawanna 6 case?

15   A.  Yes, sir.

16   Q.  Extensive reporting in this community, as you

17   recall it, right?

18   A.  Yes.

19   Q.  You lived here at that time?

20   A.  Yes, sir.

21   Q.  Extensive reporting throughout the whole world,

22   you recall that?

23   A.  I know that there was extensive reporting in

24   Buffalo.

25   Q.  Okay.  And throughout Western New York, that

1    included Niagara County as well, correct?

2    A.   Correct.

3    Q.   And that was activity by the Joint Terrorism

4    Task Force, correct?

5    A.   Yes, it was.

6    Q.   It was very clear that they were put together

7    to investigate potential terrorism, correct?

8    A.   Yes.

9    Q.   All right.

10           MR. LaTONA:   That's all I have.   Thanks,

11   Mr. Taylor.

12           MR. PIMENTEL:   Judge, brief -- brief

13   redirect, if I may.

14   REDIRECT EXAMINATION BY MR. PIMENTEL:

15   Q.   When you spoke to Special Agent Bernhard at the

16   hospital prior to interviewing Mr. O'Neill, did you

17   ask Special Agent Bernhard whether or not he or

18   Evans had given a rights warning to O'Neill?

19   A.   No.

20   Q.   You did not have that discussion?

21   A.   No.

22   Q.   Okay.   So you did not have an understanding one

23   way or the other whether they had read him his

24   rights?

25   A.   I knew that he was not in custody.

1    Q.   Okay.  That leads to my second question then.

2    When you entered the room, did you read him his

3    rights?

4    A.   No.

5    Q.   Why not?

6    A.   Because he was not in custody.

7    Q.   And do you know if Special Agent Bernhard had

8    the same understanding?

9         MR. LaTONA:  Objection.  He's asking him

10   to speculate on someone else's state of mind.

11        THE COURT:  I'll sustain the objection.

12        MR. PIMENTEL:  Well, I asked him do you

13   know if he had, not --

14        THE COURT:  He couldn't possibly know.

15        MR. PIMENTEL:  Well, if Bernhard said --

16        THE COURT:  Did he say anything about it?

17        THE WITNESS:  About what, your Honor,

18   specifically?

19   BY MR. PIMENTEL:

20   Q.   Did he say one way or the other whether O'Neill

21   was in custody?

22   A.   I don't recall that being a part of the

23   conversation.

24   Q.   Okay.  Did he say whether O'Neill had been

25   arrested?

1    A.   That -- we never had that conversation.   There

2    was -- again, from my perspective there was a

3    common understanding that he had not been arrested.

4    There was no immediate arrest pending.   And that he

5    was not in custody.

6    Q.   And you certainly didn't arrest him?

7    A.   No, sir.

8    Q.   And neither of the agents you were with

9    arrested him?

10   A.   No.

11   Q.   And you didn't arrest him when you left?

12   A.   That's correct.

13            MR. PIMENTEL:  All right.  Thank you.

14            MR. LaTONA:  Just briefly.

15   RECROSS-EXAMINATION BY MR. LaTONA:

16   Q.   Now, you indicated that it's your position that

17   Mr. O'Neill was not in custody, correct?

18   A.   Yes, sir.

19   Q.   All right.  When you entered the hospital room,

20   where was he?

21   A.   Lying in his hospital bed.

22   Q.   All right.  You knew at the time you entered

23   that room that he had been involved in an

24   explosion?

25   A.   Yes.

1     Q.   Did you know when you entered that room that

2     his left leg had been amputated?

3     A.   Yes.

4     Q.   You knew when you went into that room that he

5     was incapable of getting up and walking out of that

6     room, correct?

7     A.   Unless he hobbled on one leg.

8     Q.   All right.

9     A.   I would assume.

10    Q.   All right.   But he was in a bed, right?

11    A.   Yes, sir.

12    Q.   He had lost his leg?

13    A.   Yes.

14    Q.   Do you recall him being hooked up to any

15    medical devices at the time?

16    A.   No, I don't.

17              MR. LaTONA:   That's all I have.

18              THE COURT:   Nothing further.

19              MR. PIMENTEL:   One further -- one

20    redirect, Judge.

21        Had Mr. O'Neill asked you to leave, would you

22    have left?

23              THE WITNESS:   Yes.

24              MR. PIMENTEL:   Thank you.

25              THE COURT:   All right.   Thank you.   You

1    may step down.

2              THE WITNESS:  Thank you, your Honor.

3              THE COURT:  Call your next witness.

4              MR. PIMENTEL:  No further witnesses,

5    Judge.

6              THE COURT:  All right.

7              MR. PIMENTEL:  The only thing I would do,

8    unless Mr. LaTona will stipulate to it, is recall

9    Bernhard to do the identification, but --

10             THE COURT:  That's not the issue in the

11   suppression hearing.

12             MR. LaTONA:  Yeah.  Yeah, I don't see any

13   need to do that, Judge.

14             MR. PIMENTEL:  Okay.

15             THE COURT:  And neither does the Court.

16             MR. PIMENTEL:  All right.

17             MR. LaTONA:  Thank you.

18             MR. PIMENTEL:  I'm finished, your Honor.

19             THE COURT:  Mr. LaTona.

20             MR. LaTONA:  Great minds think alike.  I

21   have subpoenaed Investigator Evans, and I'd like to

22   call him.

23             THE COURT:  All right.

24        Mr. Pimentel, you want to tell your people that

25   they can leave?

1              MR. PIMENTEL:  Sure.

2              THE COURT:  Hold on one second.

3              MR. LaTONA:  Of course, Judge.

4              THE COURT:  Come on up, sir.  Come on up

5      this way.  Raise your right hand.

6    W I L L I A M   E V A N S, having been duly sworn as

7    a witness, testified as follows:

8              THE COURT:  Please be seated.  State your

9      full name, spell your last and your assignment.

10              THE WITNESS:  My name is William Evans,

11      E-V-A-N-S.  I'm employed with the Niagara County

12      Sheriff's Office.

13              THE COURT:  You may proceed.

14              MR. LaTONA:  Thank you, Judge.

15    DIRECT EXAMINATION BY MR. LaTONA:

16    Q.  Good afternoon, Investigator Evans.

17    A.  Hello, sir.

18    Q.  By whom are you employed?

19    A.  Niagara County Sheriff's Office, sir.

20    Q.  And how long have you been with the Niagara

21    County Sheriff's Department?

22    A.  Coming up on 30 years, sir.

23    Q.  And you are in what unit of that department?

24    A.  At this time I'm presently in the criminal

25      investigation unit, sir.

1   Q.  All right.  Back in July of 2015, what unit
2   were you with?
3   A.  The present unit, sir, criminal investigation.
4   Q.  And how long have you been a criminal
5   investigator with the Niagara County Sheriff's
6   Department?
7   A.  Approximately 27 years, sir.
8   Q.  All right.  Now, calling your attention to
9   July 21, 2015, if you have that date in mind, did
10  you in some fashion become involved in an
11  investigation into an explosion at 6761 Walmore
12  Road in the Town of Niagara?
13  A.  Yes, sir.
14  Q.  And how did you become involved?
15  A.  I was notified by the sheriff's dispatch to
16  respond.  My assistance was requested by the shift
17  supervisor, sir.
18  Q.  And which supervisor was that?
19  A.  We had two on the scene, Captain Jill
20  Herrington and Lieutenant Steve Broderick, sir.
21  Q.  Do you recall exactly the time of day that you
22  received that call?
23  A.  No, sir, I do not.
24  Q.  Now, Captain Herrington, was she part of the
25  Criminal Investigative Bureau?

1    A.   No, sir.

2    Q.   Do you recall what time you arrived at the

3    scene?

4    A.   The exact time, no, sir.

5    Q.   Is there a record that would indicate exactly

6    what time you arrived at the scene?

7    A.   Yes, sir, there would be, but I do not have it

8    present with me, sir.

9    Q.   All right.  And what would that record be?  How

10   would one refer to it in the books and records of

11   your department?

12   A.   When I arrived at the scene, 6761 Walmore Road,

13   I indicated through my police radio that I was on

14   scene.

15   Q.   Okay.  Did you make any other record other than

16   radioing in?

17   A.   I guess I don't understand your question, but,

18   no, sir, I did not.

19   Q.   Okay.  And that would be on the dispatch

20   communications, as you would understand it?

21   A.   That's correct, sir.

22   Q.   All right.  Did you have like a car number that

23   you operated under at that time?

24   A.   Yes, sir.

25            MR. PIMENTEL:  Your Honor, I'm going to

1    object.  We're here to talk about an interview at

2    the hospital.  This is not a discovery hearing,

3    which is what Mr. LaTona, respectfully, is turning

4    it into.

5            MR. LaTONA:  No, I just -- I'm going to be

6    done with this line very quickly.

7            THE COURT:  How quickly?

8            MR. LaTONA:  When he answers this one

9    question.

10           THE COURT:  That will be it then.

11   BY MR. LaTONA:

12   Q.  Did you have a car number associated with you?

13   A.  Yes, sir.

14   Q.  Which one was that?

15   A.  Car 58.

16   Q.  582?

17   A.  No, sir.

18           THE COURT:  Five eight.

19           MR. LaTONA:  Oh, I'm sorry.  Five eight,

20   forgive me.  Okay.

21   BY MR. LaTONA:

22   Q.  There came a time that a decision was made to

23   proceed to ECMC?

24   A.  That's correct.

25   Q.  All right.  You knew that Mr. O'Neill had been

1   taken there, correct?

2   A.  I was informed, yes, sir.

3   Q.  All right.  Now, do you recall who it was that

4   made the decision that any law enforcement should

5   go to ECMC to interview Mr. O'Neill?

6   A.  Captain Neubauer was the highest-ranking

7   supervisor on scene.  She was my supervisor.  That

8   conversation took place in her presence, sir.

9   Q.  All right.  In essence, did she order you to go

10  to ECMC to conduct an interview of O'Neill?

11  A.  It was a game plan.  It wasn't an order, no,

12  sir.

13  Q.  Well, how did the game plan come into

14  existence?

15  A.  We're still working through processing the

16  scene.  We knew that contact with Mr. O'Neill

17  needed to be made, and I was one of the lead

18  investigators at that time, sir.

19  Q.  All right.  Now, who participated in the

20  formulation of this game plan at the time it was

21  put in place?

22  A.  There was a number of people there at the

23  scene.  I do not know all the different agencies

24  that was there.  Myself, Agent Bernhard, he was

25  there.  Investigator Taylor was there on scene.

1    Captain Neubauer.  The sheriff had showed up at

2    some point.  There was state police there, who I

3    didn't know, sir.

4    Q.  Captain Neubauer, what division of the

5    sheriff's department was she a part of?

6    A.  She was a supervisor of the Criminal

7    Investigation Bureau, sir.

8    Q.  She was the head of CIB at that time?

9    A.  Yes, sir.

10   Q.  All right.  Now, do you recall how the decision

11   was made that it would be you and Mr. Bernhard that

12   would go to ECMC?

13   A.  No, sir, I do not.

14   Q.  Now, when you went to ECMC, did you go there

15   together with Mr. Bernhard?

16   A.  Yes, sir, I did.

17   Q.  Okay.  Was there conversation between the two

18   of you as to exactly what protocol to follow in

19   interviewing O'Neill?

20   A.  There was general conversation.  Exact

21   protocol, no, sir, I don't remember.

22   Q.  Do you recall the conversation?

23   A.  At this time I do not.

24   Q.  Was there any record made of the communication

25   between you and Bernhard on the way over?

1    A.   I did not make any records of that conversation

2    between Bernhard and I on the way over, sir.

3    Q.   Was there discussion about having an audio

4    recording of the interview of O'Neill?

5    A.   There was a discussion, but it was pretty much

6    a decision that I offered at the last moment, sir,

7    prior to going into the room.

8    Q.   All right.  So -- so the determination was made

9    at the hospital as opposed to on the way to the

10   hospital, is that the way you recall it?

11   A.   As I recall it, sir.

12   Q.   Okay.  And before entering the room, did you

13   indicate to Bernhard that you were going to record

14   the conversation?

15   A.   I believe I did.

16   Q.   That's the way you recall it.  You volunteered,

17   and then you assumed the responsibility to record

18   the interview, right?

19   A.   I volunteered and I assumed the

20   responsibilities, yes, sir, I did.

21   Q.   And Bernhard agreed, right?

22   A.   There wasn't -- no, there was no resistance

23   from Agent Bernhard not to do it.

24   Q.   Silence is acquiescence in your mind at that

25   time, is that fair?

1   A.  Well, one's perception.  But I continued to

2   record, sir.

3   Q.  All right.  And what device did you use to

4   record the interview?

5   A.  My work cell phone.  The one I had at that time

6   there was a recording app, and I used that one,

7   sir.

8   Q.  Now, is that a device issued to you by the

9   sheriff's department?

10   A.  Yes, sir.  The cell phone, yes.

11   Q.  Now, when did you learn that the entirety of

12   the interview was not captured on that device?

13   A.  Initially I was having some issues shortly

14   after I entered the room.  There was a light that

15   was blinking.  I saw Mr. O'Neill look in the area

16   of my wrist, my hand, which drew my attention to

17   the cell phone I had in my hand, which was

18   recording the conversation, so I thought.  And I

19   checked it.  I inadvertently must have hit it off,

20   and then I turned it back on, sir.

21   Q.  Now, do you recall also in the room you making

22   handwritten notes?

23   A.  I did not make any handwritten notes inside the

24   room, sir, no, sir.

25   Q.  All right.  After the interview did you make

1  handwritten notes regarding the interview?

2  A.  Yes, sir, I did.

3  Q.  Where did you do that?

4  A.  It would have been back at my office, sir.

5       MR. LaTONA:  I think we're on C.  May I?

6       THE COURT:  Um-hum.

7  BY MR. LaTONA:

8  Q.  Investigator Evans, I'm going to hand you

9  what's been marked as Defendant's Exhibit C, and

10 I'm wondering if for the Court you could identify

11 what that exhibit is?

12 A.  Yes, sir, I can.

13 Q.  What is it?

14 A.  It's a copy of handwritten notes that I

15 generated, sir.

16 Q.  Okay.  And you brought those notes to court

17 today pursuant to my subpoena?

18 A.  Yes, sir.

19 Q.  And we provided them to Mr. Pimentel so he can

20 make copies for me and for him?

21 A.  That's correct, sir.

22 Q.  Now, your effort in putting these together was

23 to memorialize what O'Neill told you, correct?

24 A.  Briefly, yes, sir.

25 Q.  All right.  To summarize the interview, is that

1    fair?

2    A.   That would be a fair statement.

3    Q.   Now, he indicated about watching on YouTube

4    this -- using explosives to get rid of stumps, do

5    you recall that?

6    A.   Yes, sir, I do.

7    Q.   And do you recall him indicating that there

8    were stumps in the backyard of that property at

9    6761 Walmore Road?  Do you remember him saying that

10   to you at the time of the interview?

11   A.   No, sir, I do not.

12   Q.   Could you please turn to page 2 of Defendant's

13   Exhibit C and go down to the third line and just

14   read that to yourself?

15   A.   Stump in backyard.

16   Q.   Okay.  Does that refresh your memory that he

17   indicated that there were tree stumps in the

18   backyard?

19   A.   Yes, sir.

20   Q.   That's what he said at that time?

21   A.   That's correct.

22   Q.   To your knowledge did anybody ever go back

23   there to see if there were any stumps?

24   A.   Yes, sir.

25   Q.   Who went back there?

1    A.   I did.

2    Q.   Did you photograph the scene?

3    A.   I did not photograph the scene at all.

4    Q.   Did you see stumps?

5    A.   I did not see any stumps, sir.

6    Q.   How far in the property did you go?

7    A.   I don't know where the property lines start or

8    end, but I -- the area that's mowed I covered that

9    straight, I think it would be southward, behind the

10   house.  And there's some high weeds that started to

11   grow.  I looked around in there.

12   Q.   Okay.  But you did not know the totality of

13   that property, as you've indicated, correct?

14   A.   That is correct, sir.

15          MR. LaTONA:  That's all.  Thanks a lot,

16   Mr. Evans.  I appreciate it.

17          THE COURT:  Anything?

18          MR. PIMENTEL:  Very briefly, your Honor.

19   CROSS-EXAMINATION BY MR. PIMENTEL:

20   Q.   Have you heard the recording, such as it is,

21   that was made -- that you made in the hospital

22   room?

23   A.   Yes, sir, I have.

24   Q.   To your recollection, was there conversation

25   prior to the beginning of that recording that

1  occurred?

2      I'll rephrase it if you don't understand.

3  A.  Okay.

4  Q.  Well, in fact, why don't I just play it.

5      While this is resetting, let me ask it this

6  way.  On direct examination I think you referenced

7  that you noticed Mr. O'Neill looking at your phone

8  when you were in the room, is that right?

9  A.  That's correct.

10  Q.  Okay.  And you said that you saw a red light

11  flashing?

12  A.  A blinking light, sir.

13  Q.  Blinking?

14  A.  Um-hum.

15  Q.  All right.  And it was at that point that you

16  began recording, is that correct?

17  A.  No, sir.  I started the recording just prior to

18  walking into Mr. O'Neill's room, sir.

19  Q.  Okay.  And then you noticed this red light

20  blinking?

21  A.  That's correct.

22  Q.  And what did you do then?

23  A.  I stopped the recording and restarted it, sir.

24  Q.  And was there more recording done after that to

25  your knowledge?

1    A.   It continued to record.

2    Q.   Okay.

3              (The above-referenced audio recording was

4              played.)

5    BY MR. PIMENTEL:

6    Q.   Okay.  Now, did you hear at the beginning -- is

7    that the recording as you recall it, such as it is,

8    from July 21st, 2015?

9    A.   Yes, sir.

10   Q.   Okay.  And are the first words that you hear on

11   the recording "I'm okay if you stay?"

12   A.   From what I hear, yes, sir.

13   Q.   Okay.  And was that Bernhard --

14   A.   Yes.

15   Q.   -- speaking?  Do you recall who he was speaking

16   to?

17   A.   Mrs. Ross.

18   Q.   Okay.  Was there any conversation from the time

19   you walked in the room prior to that?  Like were

20   there any introductions or anything?

21   A.   There was just a brief introduction as I

22   recall, and not much more than that, sir.

23   Q.   Okay.  And then what you heard after that was

24   the entirety of the recording, again, such as you

25   had?

1    A.   That's correct.

2              MR. PIMENTEL:  All right.  That's all I

3    have.

4              THE COURT:  Mr. LaTona, anything else?

5              MR. LaTONA:  No, I have nothing further.

6    Thank you very much, Investigator Evans.

7              THE COURT:  Okay.  Thank you very much.

8    Call your next witness.

9              MR. LaTONA:  That's it.

10             THE COURT:  Okay.  All right.

11             MR. PIMENTEL:  We will order, Judge.

12             THE COURT:  I'm sorry?

13             MR. PIMENTEL:  We'll order.

14             THE COURT:  You'll order, okay.  That's

15   the first question.  You'll order the transcript.

16             MR. PIMENTEL:  We'll order the transcript.

17             MR. LaTONA:  Yes.

18             THE COURT:  Second --

19             MR. LaTONA:  We definitely --

20             THE COURT:  How much time will you need

21   after the filing of the transcript to supplement?

22             MR. LaTONA:  Yeah, it's good, because I

23   would like to have his testimony to supplement,

24   Judge.  I would need at least two weeks from the

25   receipt of the transcript to supplement and then

1   file a memo of law.

2           THE COURT:  All right.  You'll have 14

3   days from the date of the filing of the transcript.

4       Mr. Pimentel, would you like seven days to

5   respond?

6           MR. PIMENTEL:  Yes, your Honor.

7           THE COURT:  All right.  Seven days after

8   the government will respond.  I'll consider it

9   submitted, and if there are new issues, the Court

10  will notify you of --

11          MR. LaTONA:  Yeah, Judge, they're going to

12  be some new issues, and I just -- just to give your

13  Honor somewhat of a head's up, and during the

14  testimony -- this is going to be very important in

15  terms of a supplementation.  That there was

16  testimony -- I think it was from Mr. Taylor --

17  regarding this crime scene log or whatever it is.

18  Critical, Judge.  It's critical that that be

19  produced.

20          THE COURT:  Okay.  You're going to look

21  for that?

22          MR. PIMENTEL:  Sure.

23          THE COURT:  If it exists --

24          MR. PIMENTEL:  Yes.

25          THE COURT:  -- as soon as it is

1  practicable --

2          MR. PIMENTEL:  Yes, your Honor.

3          THE COURT:  -- I want it given to

4  Mr. LaTona.

5          MR. PIMENTEL:  It was this EC is I think

6  what the reference was, electronic communication.

7          MR. LaTONA:  No.  EC I think had to do

8  with some of his activities during the time he got

9  called in the morning and up until the interview,

10  and that it was an FBI -- that's from the FBI, as I

11  recall the testimony.  The crime scene log is

12  there's some individual in the sheriff's

13  department --

14          THE COURT:  That's different.

15          MR. LaTONA:  -- keeps track of everybody

16  and what time they get to the crime scene.  We need

17  that as well.  Those are -- those are the two,

18  together with the material that I received from

19  Mr. Evans just today.

20          THE COURT:  All right.  Well,

21  Mr. Pimentel, you know what you ought to do.

22          MR. PIMENTEL:  Sure.

23          MR. LaTONA:  And, Judge, the only other

24  thing -- and I don't want to beat a dead horse, but

25  the last time we were here and in my response to

1    this motion to quash I invited your Honor's

2    attention to several circuit cases that hold that

3    any information favorable to a defendant on a

4    suppression motion is Brady material and it should

5    be turned over.  Clearly, there's a joint task

6    force here, joint investigation, and I know

7    Mr. Pimentel, as I recall, maybe I'm wrong, I

8    recall him saying hey, if anything comes to my

9    attention I'll turn it over.

10                MR. PIMENTEL:  Yes.

11                MR. LaTONA:  Well, then I was correct in

12   my recall.  I think the mandate from the Supreme

13   Court in Kyles versus Whitley is he has an

14   affirmative obligation to go to the files of all

15   investigative agencies that participated in this

16   proceeding to find out if there is any such

17   material.  So, I just want the record to be clear

18   in that regard.

19                THE COURT:  Mr. Pimentel is aware of that.

20                MR. PIMENTEL:  Yes.

21                MR. LaTONA:  Okay.

22                THE COURT:  All right.

23                THE CLERK:  Judge, if I may, one

24   housekeeping matter, in terms of exhibits that were

25   used at the hearing today, I have only Government

1    Exhibit 1 in evidence.

2              MR. PIMENTEL:  Correct.

3              MR. LaTONA:  Correct.

4              THE COURT:  The defense had for

5    identification A, B, and C, and they were just for

6    identification?

7              MR. LaTONA:  Yes, Judge.  I didn't put any

8    in.

9              THE COURT:  All right.  Good.

10             MR. LaTONA:  Thank you very much, your

11   Honor.

12             THE COURT:  Good luck.  All right.

13             MR. PIMENTEL:  Oh, I'm sorry.  Back to the

14   timeline, so this was -- the 14 days was to

15   supplement his motions, is that right?

16             THE COURT:  Yes.  Yes.

17             MR. PIMENTEL:  And then seven days

18   thereafter for the government to respond?

19             THE COURT:  Yes.

20             MR. PIMENTEL:  So there is not a schedule

21   yet in place for submission relative to this

22   hearing?

23             THE COURT:  Not yet.

24             MR. PIMENTEL:  Okay.

25             THE COURT:  Unless you want me -- I can

1    set it now.

2              MR. LaTONA:  Well, here's the thing,

3    Judge, it's going to depend on the tran -- there's

4    going to be a new motion anyway, so I know you like

5    to consolidate --

6              THE COURT:  Yeah.

7              MR. LaTONA:  -- everything, so --

8              THE COURT:  That's fine, unless you

9    want --

10             MR. PIMENTEL:  No.  I just wanted to make

11   sure I wasn't missing something.

12             MR. LaTONA:  No.  No.

13             THE COURT:  No.

14             MR. LaTONA:  No.  And, of course, motions

15   are pending.

16             THE COURT:  Yeah, time is excluded as a

17   matter of law.  Good day.

18             MR. LaTONA:  Thank you.

19             MR. PIMENTEL:  Thank you, Judge.

20             THE COURT:  All right.

21             *      *      *      *      *      *

22

23

24

25

1                    CERTIFICATION

2

3          I certify that the foregoing is a

4      correct transcription, to the best of my

5      ability, from the electronic sound recording

6      of the proceedings in this matter.

7

8

9                         s/Michelle L. McLaughlin
                          Michelle L. McLaughlin, RPR
10                            Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25