UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

United States of America

**Decision and Order
and
Report and Recommendation**

15–CR–151W

v.

Michael O'Neill,

Defendant.

## I.   INTRODUCTION

In his own words, defendant Michael O'Neill ("O'Neill") "blew [his] foot off" (Dkt. No. 46-1 at 28) during an explosion in his family's garage in the early morning hours of July 21, 2015. First responders tended to O'Neill and law enforcement agents entered the garage to determine the cause of the explosion.  The discovery of what looked to the agents like fireworks and homemade bombs prompted a cascade of events that led to this case.  Law enforcement agents notified the Erie County Bomb Squad and the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to secure the garage that day.  By noon on July 21, law enforcement agents obtained a state search warrant to search the garage and the family home for evidence of fireworks and explosive devices.  Two days later, this Court signed a criminal complaint charging O'Neill with possession of unregistered firearms in violation of 26 U.S.C. § 5861(d).  A grand jury later indicted O'Neill for similar statutory violations pertaining to the unlawful making and possession of a destructive device.  The Hon. Elizabeth A. Wolford has referred this case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 12.)

On February 26, 2016, O'Neill filed omnibus pretrial motions including motions to suppress evidence obtained from the family garage, from the execution of the state search warrant, and from certain hospital interviews that occurred.  (Dkt. No. 46.)  The Government filed its responses on March 16, 2016.  (Dkt. No. 47.)  The Court heard oral argument on March 29, 2016 (Dkt. No. 51) and held a suppression hearing on July 20, 2016 (Dkt. No. 67).  After considering all of the parties' papers including supplements and post-hearing briefing, the Court issues its decisions and recommendations as described below.

## II.    BACKGROUND[1]

### A.    *Initial 911 Call and Warrantless Search*

This case concerns allegations that O'Neill unlawfully made and possessed pipe bombs and components of explosive devices in his family's garage.  When the alleged activity began is unknown.  What is known is that the alleged activity came to the attention of law enforcement through a 911 emergency call from O'Neill's mother around 3:38 AM on July 21, 2015.  (*See* Dkt. No. 46-1.)[2]  Early in the call, O'Neill's mother Linda Ross ("Ross") reports an explosion in the garage, a garage that is detached from the family home at 6761 Walmore Road.  O'Neill's mother reported smoke and fire coming out of the garage.  During the call, the 911 operator confirmed that O'Neill suffered a severe injury to his left foot and that everyone had evacuated from the garage.  When Ross gave final confirmation of the garage's evacuation, she commented that

---

[1] To the extent that the parties have pointed to discrepancies in their papers, this Background section constitutes the Court's factual findings and assessments of witness credibility.

[2] O'Neill does not make clear who prepared the transcript of the 911 call.  Nonetheless, and without prejudice to any evidentiary objections at trial, the Court infers that O'Neill considers the transcript substantially accurate because he chose to attach it to his motion papers.

"there's no fire." (*Id.* at 30.)  Whether Ross reversed her prior observation of smoke and fire, or whether she meant to say that any fire that she saw ended quickly, is not clear; the Niagara County Sheriff field case report seems to make the former scenario more likely.  (*See* Dkt. No. 46-1 at 25 ("When I arrived I was immediately advised by William Ross and Linda Ross that there was no fire, but there had been some kind of explosion in the garage and that Linda's son, Michael O'Neill, was severely injured."); *see also* Dkt. No. 47-1 at 3 ("Upon initial investigation of the scene, it was determined that there was no fire, but there appeared to have been an explosion which caused the injury to MICHAEL'S left foot.").)

Niagara County Sheriff's Deputies were the first emergency personnel to arrive at the garage after the 911 call.  Emergency medical personnel arrived shortly thereafter to tend to O'Neill.  The Deputies observed that the garage was full of smoke and that the explosion occurred in the back part of the garage.  Over O'Neill's objection "to not touch his 'stuff' and to stay away from his 'stuff'" (Dkt. No. 46-1 at 25) the Deputies isolated the garage from further entry by anyone except emergency responders.  The Deputies then entered the garage to determine the cause of the explosion and found "what appeared to be gun powder and a possible pipe bomb made from a flashlight.  At this time we backed out of the garage until we could get assistance with handling explosives on scene." (Dkt. No. 47-2 at 3.)  The Deputies arranged for Erie County Bomb Squad and ATF agents to respond to the scene for further investigation.  The following paragraph from the pre-indictment complaint summarizes what law enforcement agents found while trying to determine the cause of the explosion:

> While in the garage, officers discovered what appeared to be an area of the garage where explosive devices were being manufactured.  Officers discovered what

appeared to them to be an explosive powder and BB's in plain view. Upon further inspection, Bomb Squad personnel discovered what preliminarily appeared to be seven improvised explosive devices. Six of the devices were constructed of hard cardboard tubing, sealed ends, and a fuse. One of those devices was labeled, "Powder w/Nails." An additional device was made out of a flash light with sealed ends and hole with a wick coming from the center. Other items discovered on the property include two pill bottles labeled as flash powder, one bag of potassium perchlorate, thirty-six shotgun shells reloaded with fragments inside, one plastic bottle of triple seven powder, one plastic box of triple seven pellets, and plastic bottle labeled as triple seven powder.

(Dkt. No. 1 at 3; *see also id.* at 4 ("On July 22, 2015, Erie County Sheriff's Bomb Squad

Commander Dan Walczak x-rayed the device labeled 'Powder w/Nails.' The x-ray revealed nails

packed into the device. The device was then disassembled. Inside the device were multiple nails,

BB's and suspected flash powder."); Dkt. No. 9-1.)

B.     *Statements at ECMC*

Emergency medical personnel took O'Neill to Erie County Medical Center ("ECMC").

O'Neill underwent amputation of his left leg below the knee. While O'Neill recovered from

surgery at ECMC, law enforcement agents visited him at different times to interview him. One of

the agents who interviewed O'Neill was Jason Bernhard ("Bernhard") from the ATF. Bernhard

went to ECMC around 4:00 PM on July 21 with Niagara County Sheriff's Deputy William Evans

("Evans"). Hospital staff gave Bernhard and Evans permission to go to O'Neill's room. (Dkt. No.

68 at 9–10 (hereinafter [9–10]).) Bernhard inquired whether O'Neill were in any condition to be

interviewed, given his injury and any medications administered, but hospital staff left the issue for

Bernhard to determine. [27.] When Bernhard and Evans arrived at the room, they found O'Neill

there with Ross. [11.] Bernhard told O'Neill that he and Evans were not there in an adversarial

posture; Bernhard said that "we're not here to be adversarial with you. We're just looking to figure

out what happened to you today."  [38]; *see also generally* Gov't Ex. 1 (Audio CD on file).[3]  Prior to arriving at ECMC, though, Bernhard considered O'Neill a criminal suspect and wanted to gather evidence against him.  [30.]

The interview then proceeded.  Bernhard did not consider O'Neill under arrest and did not administer *Miranda* warnings.  [12–13.]  Bernhard even told O'Neill that he was not under arrest.  [14.]  During the interview, none of the three men raised his voice at any time.  [13.]  Neither Bernhard nor Evans ever displayed a firearm [14], though Bernhard had one and could not recall whether it had been visible to O'Neill [33].  Bernhard also could not recall whether he had handcuffs with him.  [33.]  Bernhard knew that O'Neill had prior law enforcement experience, but Ross did mention that O'Neill had familiarity with legal terms.  [14–15.]  O'Neill asked whether he could face charges, and Bernhard said yes.  [15.]  O'Neill also told Bernhard that he knew that Bernhard could lie to him during the interview.  [16.]  Bernhard acknowledged that O'Neill was right but asserted that no deception was occurring at that time.  [16.]  Bernhard then asked O'Neill to explain what happened.  O'Neill

> explained that he had been watching YouTube videos about M80s and removing
> tree stumps, and he had made some M80s.  And then while he was making some,
> he was using a heat gun gluing—I would call I guess the cartridge.  And while he was
> gluing the M80, it ignited, it dropped on the floor, and he attempted to put it out,
> and it went off.

[15.]  O'Neill expressed his view that the explosive that he was creating "was legal depending on how you use it."  [16.]  At some point in the interview, O'Neill used the phrase "mens rea."  [16.]

---

[3] Bernhard did testify that ATF has a policy regarding the recording of interviews.  "They're for custodial interviews where the person's under arrest and at a law enforcement facility."  [24.]  Bernhard also testified, though, that Evans actually did the recording.  [26.]  Evans confirmed that he made the recording with his work telephone.  [87.]

When Bernhard asked O'Neill questions about BBs and nails found at the scene, O'Neill responded by saying, "I invoke." [17.] Bernhard understood that phrase to mean that O'Neill was invoking his *Miranda* rights and that "he may not want to talk to us anymore." [45.] After O'Neill "invoked," he asked Bernhard questions about items that might have been seized from the family residence. [17.] As Bernhard's interview drew to a close, he told O'Neill to talk to Ross about whether they still wanted to talk to law enforcement agents. [18.] Bernhard then introduced O'Neill and Ross to Joseph Taylor ("Taylor"), a Niagara County Sheriff's Deputy and member of the FBI's Joint Terrorism Task Force. [18.] Bernhard and Evans then left the room for a while. [18, 53.] Bernhard never asked O'Neill to sign any statements. [37.] Bernhard made sure that Taylor knew that O'Neill used the word "invoke." [46.]

Taylor interviewed O'Neill next, accompanied by two other agents. Taylor did not see any signs that O'Neill might be impaired by medication. [54.] The agents began the interview with a conversation about items that had been found in the garage. [55.] During the conversation, O'Neill said that he was familiar with the Joint Terrorism Task Force. [55.] O'Neill's statement struck Taylor as unusual because

> it expressed a level of knowledge about how the Joint Terrorism Task Force and the task force officer relationship exists that's beyond the level that most people would know. However, I did know that Mr. O'Neill once worked for the sheriff's office in the corrections setting. And again, I thought that was a lot of information for someone to be aware of who wasn't in a criminal setting at the sheriff's office.

[58.] As the interview continued, the agents asked O'Neill about his political beliefs. [58.] O'Neill stated that his political beliefs were no one's business. [58.] After stating that he made M80s out

6

of homemade gunpowder, O'Neill declared "that if he was going to be arrested, he wanted a lawyer, he was done talking."  [59.]

C.      *State Search Warrant*

O'Neill's transport to ECMC did not end the events of July 21, 2015.  Deputies investigating the family garage concluded that O'Neill could be harboring evidence of state-law fireworks violations in the rest of the garage and the family home.  O'Neill lived in the basement of the family home but had open access to the entire structure.  Late in the morning of July 21, 2015, Deputies prepared a search warrant for the garage and the home and presented it to Niagara County Court Judge Matthew Murphy.  (Dkt. No. 46-2 at 3–5.)  In the application, Deputies listed William and Linda Ross as co-owners of the family property.  Deputies wrote that they responded to a call of a residential structure fire.  Deputies also cited an interview with William Ross among sources of information.  Judge Murphy signed the search warrant at 11:25 AM.  (*See id.* at 2.)  Judge Murphy found probable cause to believe that the family garage and home harbored evidence for violation of New York Penal Law § 265.35.  A combination of law enforcement agents executed the search warrant and took inventories between 12:53 PM and 1:40 PM.  (*Id.* at 6–21.)  From the signatures on the inventory pages, the agents involved came from the Niagara County and Erie County Sheriffs' Offices, the ATF, and the Federal Bureau of Investigation ("FBI").  William Ross also contributed his voluntary consent to the search efforts.  (*Id.* at 23.)  The major events of July 21, 2015 ended at this point.

D.    *Arrest, Federal Search Warrant, and Case Proceedings*

Federal proceedings against O'Neill began two days later, on July 23, 2015.  This Court

signed a criminal complaint charging O'Neill with possession of a firearm not registered to the

defendant in the National Firearms Registration and Transfer Record, a violation of 26 U.S.C.

§ 5861(d).  The Court held an initial appearance on July 27, 2015 at ECMC while O'Neill

convalesced.  On August 5, 2015, the Court ordered O'Neill detained.  (Dkt. No. 8.)[4]  The

Government filed the indictment on August 13, 2015.  (Dkt. No. 11.)  The indictment contains

two counts.  In Count One, the Government accuses O'Neill of unlawful making of a destructive

device in violation of 26 U.S.C. §§ 5822, 5845(a)(8), 5845(f), 5845(i), 5861(f) and 5871.  In Count

Two, the Government accuses O'Neill of unlawful possession of a destructive device, in violation

of 26 U.S.C. §§ 5841, 5845(a)(8), 5845(f), 5845(i), 5861(d) and 5871.  The Court arraigned

O'Neill on August 19, 2015.

While preliminary events in O'Neill's case unfolded, this Court issued a search warrant on

July 30, 2015 for the electronic devices seized during the execution of the state search warrant.  (*See*

*generally* Case No. 15-MJ-2128 ("SW Case"), Dkt. No. 1.)  An agent of the ATF presented the

application.  In the application, the ATF explained that it interviewed William Ross several hours

after the explosion in the garage; "Mr. Ross stated that O'Neill receives regular shipments delivered

to the house, sometimes twice a week, but Mr. Ross does not know what the shipments are."  (SW

Case, Dkt. No. 1 at 5.)  The application contained additional information including the devices

found in the garage, an unspecified "white bowl with a pink top labeled 'Sulfer' [sic] that was

---

[4] Judge Wolford and the Second Circuit have since affirmed O'Neill's pretrial detention.  (Dkt.
Nos. 35, 48.)

located behind the bar area of the residence's rec room" (*id.*), and alleged statements from O'Neill about watching videos pertaining to stump removal and explosives use. The ATF explained that it came to have possession of the electronic devices by way of the execution of the state search warrant. The ATF sought to examine the electronic devices for potential evidence of O'Neill's acquisition of both materials for explosives and the knowledge and training required for explosives production. The Court ultimately approved the application.

O'Neill filed his omnibus pretrial motions on February 26, 2016. Also pending is a motion by the Government to quash certain subpoenas that O'Neill served on federal and state law enforcement agencies. (Dkt. No. 58.) The Court will address each pending motion below.

## III.   DISCUSSION

### A.   *Motion for Rule 12 and 16 Information (Non-dispositive)*

Under Rules 12 and 16 of the Federal Rules of Criminal Procedure ("FRCP"), O'Neill seeks expert discovery and responses to certain requests about the particularization of evidence. The Government responds that it has furnished all discovery and responses required at this time and that it is aware of its continuing obligations under Rule 16. To the extent that any specific requests remain outstanding, the Government is directed either to furnish the information or to provide notice of an objection to production. The Government's response otherwise appears sufficient at this time. Accordingly, the Court denies O'Neill's motion as moot but without prejudice.

B.     *Motion for Bill of Particulars (Non-dispositive)*

O'Neill seeks a Bill of Particulars that, *inter alia*, would specify the exact item that he
allegedly manufactured and possessed; would describe any evidence that possibly would establish a
statutory exception to the definition of "destructive device"; and would explain the Government's
theory of his level of knowledge of the characteristics of any items allegedly manufactured.  (Dkt.
No. 46 at 6–7.)  The Government responds that the indictment is simple in structure and that
O'Neill has received reports, photographs, and plenty of other discovery that give him notice of
what law enforcement agents found in his garage and what charges he faces.

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of
particulars in order to identify with sufficient particularity the nature of the charge pending against
him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of
double jeopardy should he be prosecuted a second time for the same offense."  *U.S. v. Bortnovsky*,
820 F.2d 572, 574 (2d Cir. 1987) (citations omitted).  "Moreover, it is of no consequence that the
requested information would have required the disclosure of evidence or the theory of the
prosecution.  While a bill of particulars is not intended, as such, as a means of learning the
government's evidence and theories, if necessary to give the defendant enough information about
the charge to prepare his defense, it will be required even if the effect is disclosure of evidence or
of theories.  A district court judge, however, has the discretion to deny a bill of particulars if the
information sought by defendant is provided in the indictment or in some acceptable alternate
form."  *U.S. v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (internal quotation marks and citations
omitted).  Courts have denied motions for bills of particulars where "the indictment specifies the

10

time, place and nature of the alleged criminal conduct . . . . [and where] the government has produced pursuant to Rule 16 relevant police records from the date of the crime as well as the amended criminal complaint, which further specifies the acts [defendant] is accused of committing." *U.S. v. Remire*, 400 F. Supp. 2d 627, 633 (S.D.N.Y. 2005).

Here, the information that O'Neill has received so far makes a Bill of Particulars unnecessary. Through the pre-indictment complaint, photographs, and investigative reports, O'Neill knows the exact series of events that led to the prosecution of this case. Those events occurred on a single day. The number of alleged destructive devices seized from the family garage is not large, and O'Neill knows already which devices they are. O'Neill's legal arguments about exceptions to definitions and knowledge requirements seem better fitted to strategies at trial, such as Rule 29 motions or requests for particular jury charges. *Cf. United States v. Beltz*, 385 F.3d 1158, 1161 (8th Cir. 2004) (noting, without comment, an unsuccessful request for a Bill of Particulars for charges including violations of 26 U.S.C. §§ 5822 and 5861(f)). Under these circumstances, requiring the Government to set forth exactly what knowledge O'Neill had for exactly which devices would amount to requiring the Government to divulge its proof for trial. Rule 7 does not require the Government's specificity to go that far. *Cf., e.g., United States v. Monzon-Luna*, No. 11-CR-722 S-4 RRM, 2014 WL 223100, at *4 (E.D.N.Y. Jan. 21, 2014) (denying disclosure of specific instances of transportation of sex trafficking victims) (citation omitted). The Court accordingly denies O'Neill's motion for a Bill of Particulars.

C. *Motion for Preservation of Agent Notes (Non-dispositive)*

O'Neill has made a motion for preservation of agent and investigative notes. The Court granted the motion verbally from the bench on March 29, 2016. (Dkt. No. 51.) No further action appears to be needed, though the parties may revisit the issue closer to trial before Judge Wolford if necessary.

D. *Motion for FRE 404(b) and 807 Information (Non-dispositive)*

O'Neill seeks notice of evidence that the Government would use at trial under Federal Rules of Evidence ("FRE") 404(b) and 807. FRE 404(b) governs requests for disclosure of all evidence of prior bad acts that the Government intends to use in its case-in-chief. FRE 404 requires that defendants be given "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to use at trial." To the extent that the Government intends to use any such evidence of a prior bad act in its case in chief, the Government will produce all FRE 404(b) evidence as directed by Judge Wolford in the eventual trial order.

Similarly, FRE 807(b) requires reasonable notice of an intent to offer a statement that would fall under the residual hearsay exception. Since Judge Wolford will be in a better position to decide how much notice would be reasonable before trial, the Court will deny the motion but without prejudice to revisit the issue as needed after issuance of the trial order.

E. *Motion for* **Brady** */Jencks/* **Giglio** *Information (Non-dispositive)*

O'Neill seeks information subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), the Jencks Act, 18 U.S.C. § 3500, and *Giglio v. United States*, 405 U.S. 150 (1972).

O'Neill's request includes a request for information pertaining to FRE 806.  "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution . . . . Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady*, 373 U.S. at 87.  The *Brady* rule covers situations "[w]hen the reliability of a given witness may well be determinative of guilt or innocence."  *Giglio*, 405 U.S. at 154 (internal quotation marks and citation omitted); *accord United States v. Bagley*, 473 U.S. 667, 676 (1985) (plurality opinion) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule.") (citing *Giglio*).  When considering information that might fall under the *Brady* rule, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The Government does not necessarily have to await a defense request to produce information that falls under the *Brady* rule, but neither does it need to adopt an "open file policy."  *See id.* at 437; *see also United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995) ("Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense.  The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.") (citations omitted).  Also, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."  *United States v.*

*LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted).  As for the timing of *Brady* disclosure, "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made.  Thus disclosure prior to trial is not mandated.  Indeed, *Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward . . . . At the same time, however, the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use."  *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (citations omitted).

Here, the Government has acknowledged its affirmative obligations for disclosure under *Brady*, the Jencks Act, and *Giglio*, and has committed to making disclosures within the time that Judge Wolford will set in the eventual trial order.  The Government's commitment will suffice, absent a showing that a different arrangement is necessary in this case.  Accordingly, the Court denies O'Neill's motion as moot but without prejudice.

F.     *Motion for Grand Jury Disclosure (Non-dispositive)*

O'Neill included in his omnibus pretrial motions a request for the minutes of the grand jury proceedings.  O'Neill wants the minutes "to ascertain whether the jury was instructed as to the statutory exclusion set forth in 26 U.S.C. § 5845(f)" and "to ascertain whether the grand jury was instructed as to the knowledge requirement imposed by the Supreme Court in the *Staples* case." (Dkt. No. 46 at 12.)  "Parties seeking disclosure have the burden of showing that the requested material is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to

14

cover only material so needed." *In re Grand Jury Subpoena*, 72 F.3d 271, 274 (2d Cir. 1995)

(citation omitted).  Here, O'Neill's request for disclosure is too speculative.  *See U.S. v. Smith*, 105

F. Supp. 3d 255, 261–62 (W.D.N.Y. 2015).  The Court denies the motion accordingly.

> G.     *Motion to Dismiss the Indictment (Dispositive)*

O'Neill included in his omnibus pretrial motions a motion to dismiss the indictment on

Tenth Amendment grounds.  O'Neill's argument is identical in all substantive respects to an

argument that Judge Wolford already addressed when affirming his detention.  (*See* Dkt. No. 35 at

5–7.)  O'Neill has made no showing as to why the law of the case should be disturbed.

Consequently, the Court recommends denying the motion.

> H.     *Motion to Suppress Warrantless Search (Dispositive)*

O'Neill has made a motion to suppress the evidence that the Deputies and other law

enforcement agents obtained from his family's garage on July 21, 2015.  O'Neill argues that law

enforcement agents entered the garage without a need, without a warrant, and without permission.

Law enforcement agents had no need to enter the garage, according to O'Neill, because there was

no fire and because he had crawled out of the garage by the time they arrived.  That the agents had

no warrant for the garage prior to 11:25 AM is undisputed.  O'Neill also notes that he and his

mother both expressed some kind of objection to a warrantless search of the garage.  O'Neill told

the Deputies directly to "stay away from his stuff."  Ross objected indirectly by turning off the

garage light and trying to shut the garage door at one point, prompting the Deputies to tell her not

to do that.  The Government responds to the motion in two ways.  The Government first notes

that O'Neill has not filed an affidavit with personal knowledge that would give him standing to

challenge the search.  Next, the Government argues that exigent circumstances justified the entry into and search of the garage.  Ross reported an explosion that gave O'Neill catastrophic injuries to his left leg.  The Deputies arriving at the scene saw no fire but plenty of smoke in the garage.  Without any initial idea as to what had happened or whether more explosions would occur, the Government argues, the Deputies had an obligation to enter the garage to assess the risk of danger and to stabilize the scene if necessary.

A brief review of the standard governing suppression motions is warranted.  "In a motion to suppress physical evidence, the burden of proof is initially on the defendant.  Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful."  *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005) (citations omitted); *see also United States v. Carollo*, No. 09 CR. 1058 VM, 2011 WL 6935292, at *2 (S.D.N.Y. Dec. 30, 2011) (citations omitted).  "The government has the ultimate burden of persuasion."  *United States v. Magaddino*, 496 F.2d 455, 460 (2d Cir. 1974) (citation omitted).  "The standard of proof on the party who carries the burden is preponderance of the evidence."  *United States v. Allen*, 289 F. Supp. 2d 230, 242 (N.D.N.Y. 2003) (citation omitted); *accord United States v. Martinez*, 992 F. Supp. 2d 322, 332 (S.D.N.Y. 2014) ("On a motion to suppress, the government bears the burden of proving the propriety of law enforcement conduct by a preponderance of the evidence.") (citation omitted).

The Court first will address whether O'Neill has standing to challenge the search.  "It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights

were violated by the challenged search or seizure." *U.S. v. Padilla*, 508 U.S. 77, 81 (1993) (per

curiam) (citations omitted).  "The party moving to suppress bears the burden of establishing that

his own Fourth Amendment rights were violated by the challenged search or seizure.  The movant

must show that he had an expectation of privacy in the invaded place and that the expectation was

legitimate, one that society is prepared to recognize as reasonable.  In evaluating these claims, the

court generally considers whether the defendant had any property or possessory interest in the

place searched or the items seized." *U.S. v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991) (citations

omitted).  Prior to any hearing on the issue, defendants make an initial showing of an expectation

of privacy through sworn affidavits.  "[T]he Court has discretion to deny a hearing where, as here,

the defendant's papers fail to create a dispute over a material fact, where, as here, the defendant

fails to support the factual allegations of the motion with an affidavit from a witness with personal

knowledge, or where the issue involved is purely one of law." *U.S. v. Carter*, No. 11-CR-121-A,

2012 WL 4721117, at *2 (W.D.N.Y. Sept. 11, 2012) (citations omitted), *report and recommendation

adopted*, No. 11-CR-121A, 2012 WL 4713900 (W.D.N.Y. Oct. 3, 2012); *see also, e.g., U.S. v. Polanco*,

37 F. Supp. 2d 262, 264 (S.D.N.Y. 1999) ("In seeking to vindicate rights under the Fourth or Fifth

Amendments, a defendant is required to submit a sworn affidavit in order to obtain a suppression

hearing.") (citations omitted).  Here, O'Neill never submitted a factual affidavit explaining his

privacy interest in the garage and how law enforcement agents may have violated that privacy

interest.  The Court has only the proffer that defense counsel provided through the motion itself.

The proffer does not suffice to create standing, and this deficiency alone would require denying

the motion.

Even if the Court had let O'Neill file a late affidavit as it did with the motion to suppress statements, the exigent-circumstances exception to the warrant requirement allowed law enforcement agents to investigate the explosion.  "The touchstone of the Fourth Amendment is reasonableness.  The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see also, e.g., Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) ("[T]o satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.").  Warrantless searches of a premises are presumed unreasonable, *see, e.g., Payton v. New York*, 445 U.S. 573, 586 (1980), but the Government can overcome the presumption when a scenario under review falls under an established exception to the warrant requirement.  One such exception involves exigent circumstances.  "The test to determine whether exigent circumstances exist is an objective one that turns on the totality of the circumstances confronting law enforcement agents in the particular case.  The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or take action."  *United States v. Klump*, 536 F.3d 113, 117–18 (2d Cir. 2008) (internal quotation and editorial marks and citations omitted).  An example of an urgent need is a burning building; an objectively reasonable determination of a fire will justify warrantless entry even where a fire has not

18

actually occurred.  *See Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("A burning building clearly

presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' •Indeed, it

would defy reason to suppose that firemen must secure a warrant or consent before entering a

burning structure to put out the blaze.  And once in a building for this purpose, firefighters may

seize evidence of arson that is in plain view."); *Klump*, 536 F.3d at 118 ("Under these

circumstances, the firefighters had an objectively reasonable basis for believing that there was a fire

inside the warehouse.  Nothing in the Fourth Amendment required them to wait until they saw

actual smoke or flames to enter a building that they reasonably believed might be on fire.")

(citation omitted).  Another example of an urgent need is the threat posed by bombs in a

residence.  "Exigent circumstances are frequently found when dangerous explosives are involved."

*United States v. Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989) (citations omitted).  Similar types of

exigent circumstances include the odors or presence of chemicals that create a risk of explosion.

*See, e.g., United States v. Clarke*, 564 F.3d 949, 959 (8th Cir. 2009) (odors from methamphetamine

manufacturing); *United States v. Ojeda*, 276 F.3d 486, 489 (9th Cir. 2002) (same); *United States v.

Callabrass*, 607 F.2d 559, 564 (2d Cir. 1979) ("The suggestion that the entire operation was a ruse

is thus without support in the record.  As soon as Cassidy [a narcotics detective] arrived, he

ordered those present not to smoke and segregated the chemicals that would have to be removed

by the Bomb Squad from those that could be safely transported in the squad car.").  In an often

related exception to the warrant requirement, "law enforcement officers may seize evidence in

plain view, provided that they have not violated the Fourth Amendment in arriving at the spot

from which the observation of the evidence is made." *Kentucky v. King*, 563 U.S. 452, 462–63 (2011) (citation omitted).

The need to prevent further explosions and the presence of explosive materials in plain view justified the Deputies' warrantless search of the garage and subsequent seizure. Deputies responded to the garage in the first place because an explosion with catastrophic injuries already had happened. Regardless of any conflicting reports about a fire, the Deputies saw for themselves that the garage was filled with smoke. An objectively reasonable law enforcement agent would not have ruled out the possibility of future fire, smoldering, or explosions. Entering the garage allowed the Deputies to assess exactly how dangerous the situation was and how the first explosion occurred. Since O'Neill would have been doing whatever he was doing on some kind of open space like a table or workbench (*see also* Dkt. No. 9-1 at 2), the Deputies plausibly would have found in plain view the explosive materials described in the pre-indictment complaint. Under these circumstances, the Deputies' entry of the garage, though warrantless, was reasonable, and the Government has met its burden. The Court thus recommends denying the motion to suppress evidence from the warrantless search of the garage.

I.    *Motion to Suppress State Search Warrant (Dispositive)*

O'Neill has made a motion to suppress evidence obtained from the state search warrant that Judge Murphy signed. O'Neill argues that the search warrant application relied on evidence obtained from the improper search of the garage. O'Neill argues that the search warrant was too broad in that it authorized the search of the family home and not just the garage. "Other than the fact that Michael O'Neill was a resident at that location and had free access to the entire premises,

there were no facts asserted to support a belief that any seizable item was situated in any area other than in the detached garage." (Dkt. No. 46 at 16.)  O'Neill finds two other sources of overbreadth as well.  The search warrant authorized the seizure of electronic devices that, according to O'Neill, had no obvious connection to the charge under investigation pertaining to fireworks.  The search warrant authorized further the seizure of weapons or explosive devices, which O'Neill considers something other than fireworks.  O'Neill objects to the search warrant on the additional basis that it contained misrepresentations of material facts.  Among the alleged misrepresentations, O'Neill cites a false report of a fire in the garage; an incorrect and repeated reference to William Ross as a co-owner of the premises; a wrong citation to the section of the New York Penal Law concerning unlawful dealing with fireworks; an omission of O'Neill's objection to a search of the garage; an omission of O'Neill's mother's attempt to close the garage door; a failure to inform Judge Murphy that illegal use or possession of fireworks is only a violation; and Judge Murphy's failure to use his discretion to require the production of live witnesses in connection with a search warrant application.

The Government opposes all of O'Neill's arguments.  The Deputies obtained the evidence from the garage properly, according to the Government, and that evidence combined with O'Neill's unrestricted access to the home sufficed to establish probable cause to search the home and to seize evidence including electronic devices.  The Government generally downplays the alleged problems that O'Neill has identified with the state search warrant, arguing that none of those problems would have changed the sequence of events that led to the issuance of that warrant.

"Ordinarily, a search or seizure pursuant to a warrant is presumed valid.  In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure. In order to invoke the *Franks* doctrine, [defendant] must show that there were intentional and material misrepresentations or omissions in [the agent's] warrant affidavit.  A misrepresentation or omission is intentional when the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.  It is material when the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." *United States v. Awadallah*, 349 F.3d 42, 64–65 (2d Cir. 2003) (internal quotation and editorial marks and citations omitted).  "To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.*, material, a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant.  If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.  As with the inclusion of false information, omissions from an affidavit that are claimed to be material are governed by the same rules.  The ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal quotation and editorial marks and citations omitted).

Here, O'Neill has not made enough of a showing for a *Franks* hearing to disturb Judge Murphy's decision to issue the state search warrant.  As the Court explained above, the Deputies

22

properly entered the garage and seized evidence in plain view; the exigent circumstance of a known explosion required them to rule out the possibility of additional explosions. The evidence in plain view included a package that a company called "Online Fireworks" mailed to O'Neill at the family address. O'Neill has not provided any reason to think that the delivery of that package would have been sent directly to the garage and not the family home. (*See also* SW Case, Dkt. No. 1 at 5 ("Mr. Ross stated that O'Neill receives regular shipments delivered to the house, sometimes twice a week, but Mr. Ross does not know what the shipments are.").) The existence of the package created a fair probability of other packages elsewhere on the premises. Additionally, the Deputies presented Judge Murphy with a reasonable inference that fireworks activity large enough in scale to cause catastrophic injuries would have involved the use of electronic devices. Putting this information together gave Judge Murphy a fair probability that evidence concerning unlawful fireworks possession, use, or furnishing could be anywhere on the premises, especially given that O'Neill had full access to the premises. *Cf. United States v. O'Neil*, 968 F.2d 1216 (6th Cir. 1992) (upholding a search warrant of a home for evidence of unlawful explosives distribution, even though explosives were seen only in a garage on the premises); *United States v. Franjoine*, No. CR-88-68E, 1988 WL 95766, at *3 (W.D.N.Y. Sept. 14, 1988) (denying a challenge to a search warrant where available information "established the unity of usage of the house and garage, and thereby provided the probable cause to believe that evidence of drug trafficking might be uncovered in the house as well as in the garage"). As for the alleged misrepresentations of material facts, none of them pass the *Canfield* test. William Ross's co-ownership or non-ownership of the family home might have affected his standing to challenge any searches but had no impact on the probability of finding

23

evidence.  The voluntary consent to search that William Ross signed (Dkt. No. 46-2 at 23) is not

mentioned in the search warrant application and thus would not have affected Judge Murphy's

analysis.  The numerical citation to the relevant portion of the New York Penal Law is wrong, but

all other discussion of the Penal Law was correct.  There is a section of the Penal Law called

"Unlawfully dealing with fireworks and dangerous fireworks"; it happens to be Section 270.00, not

Section 265.35.  Given that the search warrant application contains the correct title for Section

270.00 and an appropriate discussion of relevant factors under that section, the Court considers

the use of the number 265.35 a clerical error, and "minor clerical errors generally are not fatal to a

search warrant."  *United States v. Waker*, 534 F.3d 168, 172 (2d Cir. 2008) (citations omitted).  As

for the use or omission of other available evidence, Judge Murphy acted within his discretion when

deciding not to hear from live witnesses.  In all, the information that substantially affected Judge

Murphy's decision was accurate and painted a fair picture of a possible fireworks or explosives

operation on the family property.  The Court thus recommends denying the motion to suppress

the state search warrant.

J.      *Motion to Suppress Federal Search Warrant (Dispositive)*

O'Neill has made a motion to suppress evidence obtained from the federal search warrant

that the Court issued on July 30, 2015.  As explained previously, the Court issued the search

warrant for the contents of electronic devices seized during the execution of the state search

warrant.  O'Neill raises several objections in support of suppression.  O'Neill notes that the federal

search warrant did not specify how a federal law enforcement agency, the ATF, came into

possession of the electronic devices when a state law enforcement agency approached a state court

24

for the warrant that led to the capture of the devices.  O'Neill argues that the federal search warrant is defective because it relies on information improperly obtained through the warrantless search of the garage and the state search warrant; O'Neill has argued elsewhere that both of those searches are subject to suppression.  O'Neill also points to several alleged misrepresentations in the federal search warrant application.  O'Neill claims that the ATF concealed that the search of the garage on the day of the explosion occurred without a search warrant.  The ATF also omitted the objections from O'Neill and his mother about entering the garage.  Finally, O'Neill argues that "[t]he warrant and the application fail[] to set forth the nexus between the purported crime under investigation and the search targets for the electronic devices."  (Dkt. No. 46 at 21.)

The Government opposes O'Neill's motion mostly for the same reasons that it opposes suppression of the state search warrant.  That is, the Government considers the warrantless search of the garage proper under the exigent circumstances doctrine.  To the extent that the federal search warrant contained information obtained from the state search warrant, the Government considers the state search warrant properly supported by probable cause.  Additionally, the Government cites the alleged statements that O'Neill made when interviewed at ECMC about watching videos.  Combined with the ATF's experience "that individuals who possess and/or manufacture destructive devices often have learned how to do so via the Internet" (Dkt. No. 47 at 22), O'Neill's alleged statements provided an additional reason to believe that the electronic devices would yield information about O'Neill's activities concerning explosives.

The standards that the Court quoted above from *Awadallah* and *Canfield*, when assessing the state search warrant, apply to the federal search warrant as well.  The Government has met its

25

burden under those standards.  The warrantless search of the garage, and the application for and execution of the state search warrant, occurred properly as explained previously.  Enough of a nexus existed between the alleged federal offense and electronic devices because O'Neill made statements (*see* [15]) about using electronic means to acquire information about explosives.  The nexus gains further support from the knowledge that O'Neill received packages regularly at the residence, that one of these packages likely was the package found during the warrantless search of the garage, and that people in this day and age frequently order packages electronically.  The omissions from the federal search warrant application about the warrantless nature of the garage search and the family objections to that search are not material.  As explained previously, exigent circumstances required the Deputies at the scene to assess the risk of further explosions; family objections could not override the Deputies' obligation to secure the safety of the scene.

O'Neill's argument about transfer of custody of the electronic devices merits a brief comment.  As an additional basis to challenge the federal search warrant, O'Neill contends that the search warrant "application contains no factual justification why items seized pursuant to a state search warrant wound up in the possession of a federal agency.  The [agent] application fails to indicate that any attempt was ever made to apply to Niagara County Court Judge Matthew Murphy for permission to have the ATF take possession of and store the electronic devices."  (Dkt. No. 46 at 20.)  O'Neill does not cite a specific authority here but likely is alluding to N.Y. Criminal Procedure Law ("CPL") § 690.55.  CPL § 690.55 makes the state court issuing a search warrant the legal custodian of any property seized under that warrant.  "Upon receiving property seized pursuant to a search warrant, the court must either: (a) Retain it in the custody of the court

pending further disposition thereof pursuant to subdivision two or some other provision of law; or (b) Direct that it be held in the custody of the person who applied for the warrant, or of the police officer who executed it, or of the governmental or official agency or department by which either such public servant is employed, upon condition that upon order of such court such property be returned thereto or delivered to another court." CPL § 690.55(1). In the context of civil forfeiture, where the litigants focus on the disposition of the property in itself, "[t]his degree of control suggests that New York's warrant and seizure scheme is jurisdictional." *United States v. $490,920 in United States Currency*, 911 F. Supp. 720, 725 (S.D.N.Y. 1996) (citations omitted). Criminal cases present a different focus on probable cause to conduct a search and whether any constitutional violations occurred during a search. "In this case, the only arguable basis for the suppression of the evidence is that its seizure violated the federal constitution . . . . Assuming that a state statute can create an expectation of privacy protectable under the Fourth Amendment—a proposition which we find quite doubtful—nevertheless it appears that § 690.55 relates primarily, if not exclusively, to the ministerial preservation of evidence rather than the protection of privacy; thus the remedy of suppression would not be applicable even in state court." *U.S. v. Mizrahi*, No. 80 Cr. 528 (MEL), 1980 WL 681433, at *2–3 (S.D.N.Y. Nov. 20, 1980) (citations omitted).

The Court finds *Mizrahi* persuasive. The electronic devices seized during the execution of the state search warrant likely would have fallen to the state court's legal custody under CPL § 690.55. As far as the Court can tell from the record, the ATF never requested a transfer order from the state court before acquiring the electronic devices. Paying closer attention to the requirements under CPL § 690.55 is the better practice, and the Court might need to take a closer

27

look at the issue during future warrant applications.  Nonetheless, and following *Mizrahi*, raising

CPL § 690.55 to the level of a safeguard of substantive rights seems like too much of a stretch

without further legislative or appellate guidance as to that statute's policy objective.  *See also*

*Virginia v. Moore*, 553 U.S. 164, 178 (2008) ("[I]t is not the province of the Fourth Amendment to

enforce state law.").

    After considering all of O'Neill's arguments, the Court recommends denying O'Neill's

motion to suppress the federal search warrant.

    K.    *Motion to Suppress Statements (Dispositive)*

    O'Neill has made a motion to suppress the statements that he gave to the two sets of law

enforcement agents who talked to him during the two interviews at ECMC.  O'Neill argues

principally that the agents improperly misled him when they told him that the interviewers were

not adversarial and designed only to determine what happened leading up to the explosion.  (*See*

Dkt. No. 81 at 6–8.)  O'Neill also has suggested that his medical condition post-surgery

compromised his ability either to consent to or to terminate the interviews.  (*See* Dkt. No. 56 at 2.)

Combining the adversarial nature of the interviews with O'Neill's inability to terminate them

meant, according to O'Neill, that the interviews were custodial interrogations that required

*Miranda* warnings.  The Government counters that the interviews remained noncustodial

conversations at all times.  (Dkt. No. 80 at 5–7.)  To the extent that O'Neill might have attempted

to invoke his right to remain silent, the Government argues that O'Neill's vague use of the word

"invoke" and selective answering of questions rendered his invocation ineffective.  (*Id.*)

28

The basic *Miranda* principles are well known.  "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.  If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.  The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."  *Id.* at 445.  The invocation of the right to remain silent must be unambiguous; if it is then the defendant cuts off all questioning about that offense.  *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (citation omitted).

"Statements elicited in noncompliance with [*Miranda*] may not be admitted for certain purposes in a criminal trial.  An officer's obligation to administer *Miranda* warnings attaches, however, only where there has been such a restriction on a person's freedom as to render him in custody.  In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation and editorial marks and citations omitted); *see also Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.").  "[A] police officer's subjective view that the individual under

29

questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda." *Id.* at 324 (citation omitted). Nonetheless, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* at 325 (internal quotation marks and citations omitted). Additionally, "custody" for *Miranda* purposes is more narrow in scope than a Fourth Amendment "seizure" with its temporary denial of the freedom to leave. *Cf., e.g., Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) ("The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*."). In the context of a hospital interview, "several circuits have concluded that *Miranda* custody is not established merely because an interview occurs in a hospital where a defendant is receiving medical treatment." *United States v. Parker*, 116 F. Supp. 3d 159, 171 (W.D.N.Y. 2015) (collecting cases).

In addition to the requirement of custody, the need for *Miranda* warnings also requires that interaction between a person and law enforcement officials qualify as an "interrogation." "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed

to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.  A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Here, several factors weigh against a finding of a custodial interrogation.  The agents used no indicia of force such as yelling, handcuffs, a display of firearms, or a threat of arrest.  *Cf. Gren v. Greiner*, 89 F. App'x 754, 757 (2d Cir. 2004) (summary order) (defendant not in custody during a hospital interview absent other indicia of force).  When O'Neill declined to answer questions about the production of M80s or about his political views, the agents moved on to the next topic in the conversation.  O'Neill's mother, Ross, was present at all times during the interviews.  *Cf. United States v. White*, 417 F.2d 89, 91 (2d Cir. 1969) (presence of another person at an interview can lessen coercion).  Finally, O'Neill's background has some significance.  O'Neill once worked in law enforcement himself and showed that he knew four things that an ordinary person might not: a working, if imperfect, use of the term "invoke" and its connection to *Miranda* warnings; the term "mens rea" with its implication that O'Neill understood legal concepts pertaining to intent; the existence and basic function of the Joint Terrorism Task Force; and the use of deception as an investigative technique.  Under *Innis*, all of the above factors indicate that O'Neill did not perceive himself as under pressure to make incriminating statements; he knew what he was willing to say and when to stop the conversation.  O'Neill thus has not made enough of a showing that the agents did anything to overcome his will.

The major cases on which O'Neill relies do not change the above analysis.  Because the Court is recommending that exigent circumstances justified the warrantless search of the garage, *Brown v. Illinois*, 422 U.S. 590 (1975), will not apply.  The search warrants at issue here did not contain the level of vagueness discussed in *United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013).  O'Neill correctly cites to the general principle in *United States v. Mast*, 735 F.2d 745 (2d Cir. 1984), that law enforcement agents cannot affirmatively mislead a defendant about the nature of an investigation.  *Mast*, however, clarifies that any misinformation must be material and must lead directly to a decision to talk.  *Id.* at 750.  The Second Circuit found no infirmity in that case where law enforcement agents made no definitive promises about potential prosecution.  Here, none of the agents made any promises to O'Neill at all, and O'Neill understood that the agents could use deception as a tactic against him.  The same analysis applies to *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987), where a general statement about misinformation yielded to the Second Circuit's specific finding that "[t]here is no evidence that any promises were made to Okwumabua or that he was subjected to any threats, physical coercion, or protracted interrogation . . . . At no time during the interview did he express a desire to contact his attorneys."  *Id.* at 953 (citation omitted).  Here, as soon and O'Neill mentioned the possibility of obtaining an attorney, the agents stopped that conversation thread.  (*See* [59] ("A. He said that if he was going to be arrested, he wanted a lawyer, he was done talking.  Q. And did you ask him any questions after that?  A. No.").)

In all, the Government has met its burden of showing that both interviews were neither custodial nor interrogations and that *Miranda* warnings were not necessary.  Without a custodial

interrogation, the Court does not need to address whether O'Neill's selective answering of questions constituted either an ambiguous invocation of *Miranda* or a sufficient waiver of *Miranda* rights.  The Court accordingly recommends denying O'Neill's motion to suppress.

L.    *Motion to Quash Subpoenas (Non-dispositive)*

Finally, the Court will address briefly the pending motion to quash certain subpoenas that O'Neill had served in preparation for the suppression hearing.  (Dkt. No. 58.)  The Government had stated in its motion papers that some information sought in the subpoenas already had been provided.  (*Id.* at 4.)  With O'Neill's suppression motions resolved as described above, any immediate need for subpoenas becomes moot.  Any need for trial subpoenas can be addressed with Judge Wolford during proceedings that will set up a trial date and a trial order.  The Court thus grants the Government's motion to quash but without prejudice to allow O'Neill to raise the issue before Judge Wolford as he may see fit.

## IV.    CONCLUSION

For all of the above reasons, the Court respectfully recommends denying O'Neill's dispositive motions to suppress evidence.  The Court adjudicates O'Neill's non-dispositive motions as explained above.

## V.    OBJECTIONS

A copy of this combined Decision and Order / Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to the recommendations for the dispositive motions must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 59.  "As a rule, a party's failure to object

to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

      SO ORDERED.

                             /s Hugh B. Scott

                             Honorable Hugh B. Scott
                             United States Magistrate Judge

DATED: November 17, 2016